## Case No. 2,043.

BROWNSVILLE v. CAVAZOS et al.

[2 Woods, 293.][1]

Circuit Court, E. D. Texas. March Term, 1876.[2]

EJECTMENT — SECOND TRIAL — LIMITATIONS—RES JUDICATA—JUDICIAL NOTICE —EMINENT DOMAIN —THE POWER—EFFECT—COMPENSATION—VALIDITY OF LEGISLATIVE ACTION—ABANDONMENT OF PUBLIC USE—MUNICIPAL CORPORATIONS—INCORPORATION—ADVERSE POSSESSION.

1. By a law of Texas, a judgment against the plaintiff in an action of trespass to try title is conclusive, unless he commences a second action within a year: *Held*, that the institution of a suit within the year by the original defendant, against the grantees of the original plaintiff for the same property, relieved the latter from the necessity of commencing suit within the year. They could defend their title in this second suit, and the

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

[2] [Affirmed by supreme court in City of Brownsville v. Cavazos, 100 U. S. 138.]

claim of res judicata by the plaintiff in the second suit would not hold.

2. Where, in an action of trespass to try title, the grantees of the plaintiff, who had lost his suit, neglect to bring a second action within a year, but the defendant in the first action sues the grantees of the plaintiff in that action for the same property, within a year after the determination of the first suit, and said grantees file a plea in the second action in the nature of a reconvention, claiming title to the property in dispute, and demanding damages for trespass thereto committed by the plaintiff: _Held_, that the plea was equivalent to a new action, and the said grantees were not concluded by the judgment in the first action.

3. The court should take judicial notice of the laws of a state whose territory once included the lands in controversy in the suit, on the ground that the laws of the former sovereignty of a country, which still affect its landed estates, are to be regarded as domestic and not foreign laws.

4. The decree of the congress of the state of Tamaulipas, of October 15, 1827, and the proceedings thereunder, did not divest the title of the owners of the land taken for the ejidos of the city of Matamoras, nor transfer their title to the city; nor was it an adjudication in rem for the expropriation of said lands without compensation, reserving to the owner the right to obtain compensation by applying therefor. The title could not be divested without compensation to the owners.

5. The validity of said decree could not be called in question, it being the act of the highest tribunal known to the laws of Tamaulipas, invested with supreme judicial as well as legislative authority, and the lands affected by it being at the time within the territory of that state.

6. A resolution of the congress of the state of Tamaulipas, passed on October 20, 1848, after the lands in dispute had become a part of the territory of the state of Texas, is not binding as res judicata upon the parties in this case; but as an authority on the law of Tamaulipas, bearing on the construction of the decree of October 15, 1827, it is of the highest value.

7. Expropriation is a seizure of so much of the private owner's property as is necessary for the public use. When the public purpose is accomplished, or has ceased to exist, the residue of the property belongs to the original owner.

8. But this reverter must be subject to any bona fide rights that may have lawfully accrued in the meantime; thus when citizens have acquired a right of perpetual occupancy of the expropriated lands, at a certain rent or any higher degree of title, they could not be deprived of it.

9. The charter of Brownsville of 1853 did not confer upon that city any title or interest belonging to the state of Texas in and to the land which was owned by the town of Matamoras on December 18, 1836.

10. Where there was a mixed possession of the property in controversy, and had been a continual contest of the parties over it, and absence of actual possession by either party of a great portion of the property, and a litigation of long standing respecting the title to it: _Held_, that no plea of prescription by either party would hold good.

[See note at end of case.]

At law. This was an action of trespass to try title [by the city of Brownsville against Maria Josefa Cavazos and others]. The parties waived a jury and submitted the is-

sues of fact as well as of law to the court. [Judgment for defendants.]

The lands in controversy were occupied by the city of Brownsville, Texas, opposite Matamoras, Mexico. They had been part of the ejidos, or town tract, of Matamoras, which extended on both sides of the Rio Bravo or Rio Grande. Texas chartered the city of Brownsville in 1852, and granted to it these lands, claiming them as part of the public domain. This charter was repealed in 1852. A new charter was granted in 1853, confirming to the citizens all their rights, but not in terms renewing the grant of the lands. This was the city's title. The defendants represented the original owners of the tract, and contended that the ejidos were never lawfully expropriated for public use; the land owner having never been settled with for the lands, which was a prerequisite under the constitution of Tamaulipas, under which the expropriation was attempted in 1826. Hence, the defendants claimed title under the original land owner, whose grant was made in 1781, and was not disputed. This was a second suit to try this disputed title. The first was commenced by Basse and Hord against the city of Brownsville in 1854, and terminated in June, 1872, in favor of the city. See City of Brownsville v. Basse, 36 Tex. 461. Stillman and Hale, original defendants in the present suit, purchased out Basse and Hord whilst the first suit was pending. By a law of Texas (Pasch. Dig. § 5298), a judgment against the plaintiff in trespass to try title is conclusive, unless he commences a second suit within a year afterwards. In this case the defendant in the first suit commenced this second suit, and the defendants did not institute any suit within the year. This raised a question of res judicata, but the court held, as the following opinion shows, that the institution of a suit by the original defendants against the grantees of the original plaintiffs relieved the latter from the obligation of commencing a suit; that they could defend their title in this suit. At all events, within the year, the defendants in this suit had filed a plea, setting up that they were owners of the land claimed by the plaintiff, and demanded damages for trespass committed thereto by the plaintiff. The court held this to be substantially a plea in reconvention, and allowed the defendants to amend it so as to make it more strictly such a plea in form as well as in substance. During the progress of the trial, a question of evidence was raised, whether the laws of Tamaulipas, in whose limits the premises in question formerly lay, must be proven, or could be judicially noticed by the court. It was held, that the court should take judicial notice of them, on the general ground, that the former laws of a country, still affecting its landed estates, are to be regarded as domestic and not foreign laws, as is done in Louisiana with regard to the old French and Spanish laws,

and in common law states with regard to the old English laws. Ennis v. Smith, 14 How. [55 U. S.] 426; U. S. v. Turner, 11 How. [52 U. S.] 664.

Nestor Maxan, Stephen Powers, and T. N. Waul, for plaintiff, cited Blair v. Odin, 3 Tex. 288; Lewis v. San Antonio, 7 Tex. 300; De Varaigne v. Fox [Case No. 3,836]; Bissell v. Haynes, 9 Tex. 584; Bass v. Fontleroy, 11 Tex. 698; Townsend v. Greeley, 5 Wall. [72 U. S.] 326; U. S. v. Rocha, 9 Wall. [76 U. S.] 639, 641; Recopilation de las Leyes de las Indias, lib. 4, tit. 5; law 6 (2 White, Recop. 44, marg. 34); Constitution of Tamaulipas, arts. 13, 92; Town of Refugio v. Byrne, 25 Tex. 193; George v. Thomas, 16 Tex. 74; Guitard v. Stoddard, 16 How. [57 U. S.] 512; Glasgow v. Hortiz, 1 Black [66 U. S.] 601. As to necessity of compensation. Cooley, Const. Lim. 560; Railroad Co. v. Ferris, 26 Tex. 601; 2 Kent, Comm. 339, note (b); Rogers v. Bradshaw, 20 Johns. 744; Smith v. Taylor, 34 Tex. 606. Action of authorities conclusive. Strother v. Lucas, 12 Pet. [37 U. S.] 437; Jenkins v. Chambers, 9 Tex. 167. Authority of the congress of Tamaulipas. Const. art. 92; Goode v. McQueen's Heirs, 3 Tex. 256; Houston v. Robertson, 2 Tex. 25; U. S. v. Palmer, 3 Wheat. [16 U. S.] 610; Foster v. Neilson, 2 Pet. [27 U. S.] 309; U. S. v. Arredondo, 6 Pet. [31 U. S.] 711; Garcia v. Lee, 12 Pet. [37 U. S.] 520; Williams v. Suffolk Ins. Co., 13 Pet. [38 U. S.] 415; Luther v. Borden, 7 How. [48 U. S.] 56; Hal. Int. Law, 117; Wheat. Int. Law, 161, 165; Elmendorf v. Taylor, 10 Wheat. [23 U. S.] 152, 159, 169; Powell v. De Blane, 23 Tex. 76; Cavazos v. Trevino, 35 Tex. 165. The act of 1850 (1st charter of Brownsville) is equivalent to office found and regrant. Town of Refugio v. Byrne, 25 Tex. 200; U. S. v. Repentigny, 5 Wall. [72 U. S.] 267; Bennett v. Hunter, 9 Wall. [76 U. S.] 336; Weber v. State Harbor Com'rs, 18 Wall. [85 U. S.] 71. Texas was legitimate successor to the rights of the city of Matamoras. Blair v. Odin, 3 Tex. 297; Chouteau v. Eckhart, 2 How. [43 U. S.] 374; Goode v. McQueen's Heirs, 3 Tex. 241; U. S. v. Repentigny, 5 Wall. [72 U. S.] 276. The grant of 1850 was irrepealable. Cooley, Const. Lim. 235–239; Schulenberg v. Harriman, 21 Wall. [88 U. S.] 44; Rice v. Minnesota & N. W. R. Co., 1 Black [66 U. S.] 358; City of Brownsville v. Basse, 36 Tex. 501.

J. R. Cox, W. P. Ballinger, and T. N. Jack, for defendants, cited Bass v. Fontleroy, 11 Tex. 698; the act to confirm old patent, passed February 10, 1852, took effect April 1, 1852; the act to incorporate Brownsville, of February 7, 1853; Chouteau v. Eckhart, 2 How. [43 U. S.] 373; Townsend v. Greeley, 5 Wall. [72 U. S.] 336; McMullen v. Hodge, 5 Tex. 82; Cooley, Const. Lim. 507, 508; Mitchell v. Bass, 26 Tex. 372.

Before BRADLEY, Circuit Justice, and MORRILL, District Judge.

BRADLEY, Circuit Justice. The property in question is within the boundary lines of a tract of fifty-nine and one-half leagues called the Espiritu Santo tract, granted by the Spanish government to one De la Garza in 1781, which grant was recognized by the legislature of the state of Texas, by the "act to relinquish the right of the state to certain lands therein named," approved February 10, 1852. It is conceded by both parties that for several years prior and up to the year 1826, one Dona Maria Francisca Cavazos was seized of the Espiritu Santo tract (including the lands in dispute) by regular deraignment of title under said grant. Madame Cavazos died in 1835, and devised the Espiritu Santo tract to three parties (one of whom was Dona Maria Josefa Cavazos), who, by an act of partition between the parties, became seized of that portion of the tract on which the premises in dispute are situated. A portion of these premises she subsequently conveyed to other persons, under whom the other defendants claim by regular deraignment of title. So that the defendants have shown title to the land in dispute for the several parts which they respectively claim, unless the plaintiff can show a better title. This the plaintiff, the city of Brownsville, attempts to do. The title set up by the city is a title by a proceeding for expropriation, by which, as they allege, the premises in dispute were expropriated as part of the ejidos (or town lands) of the city of Matamoras in 1826 and 1827.

To explain the nature of this claim, it is necessary to advert to the fact, that by the Spanish laws, which were in operation in Mexico, every corporate town became, by virtue of the act of incorporation, entitled to lay out and appropriate for the public use of the town, for streets, squares, building sites and small holdings or labors for the people, a town tract of four square leagues, to be two leagues square when admissible. The text of the law is found in 2 White, Recop. 44 (marg. 34) § 59. And see Chouteau v. Eckhart, 2 How. [43 U. S.] 373; Townsend v. Greeley, 5 Wall. [72 U. S.] 336; Hart v. Burnett, 15 Cal. 542. Mexico separated from Spain about the year 1821, and the several states adopted constitutions of government, retaining, however, the Spanish laws as far as they were applicable to their new circumstances. Amongst the rest, the state of Tamaulipas, which comprised the territory on both sides of the Rio Grande, in the lower part of its course, adopted a constitution in 1825, by the 13th article of which it was declared as follows: "Neither the congress nor any other authority shall be able to take the property, even that of the least importance, of any private individual. When it shall become necessary for an object of a common recognized utility to take the property of any person, he shall first be compensated upon the examination of arbiters appointed by the government of the state

and the interested parties." This was also substantially the old Spanish law. On the 28th of January, 1826, the congress of Tamaulipas constituted Matamoras (before called Refugio) a town, with power to take the necessary proceedings to ascertain the title to the land on which it was established, causing indemnification to be made agreeably to law, if it should belong to an individual. The town council in due time proceeded to take measures to lay out the ejidos. They caused the land owners to be notified and a survey to be made, in August, 1826. This survey took for its central point the center of the public square in Matamoras, and the ejidos was made to embrace a tract two leagues square, extending one league north, one league south, one league east, and one league west of this point. It was thus made to extend across the Rio Grande, and to include about a league and a half of the land of Madame Cavazos, which league and a half is the present site of the city of Brownsville, and is the property in dispute. The survey having been made, the next thing to be done to condemn the land for the ejidos, or town lands, was to make the required indemnification to the owner. Before this was done, the property, according to the constitution, could not be taken by the city.

But here a difficulty occurred. The indemnification must be made upon the examination of arbiters appointed by the government of the state and the interested party. But Madame Cavazos refused to co-operate in the matter; she opposed the whole proceeding. It took from her her best land, along the river front, and even took the farm which she had under her private cultivation. Various efforts were made to compose the difficulty, but in vain. At last the state congress, on the 15th of October, 1827, made a decree to the following effect: "The government, in the use of its powers, will see that the civil authorities of Matamoras compel Dona Rita Giron (another contestant) and Dona Francisca Cavazos to obey the constitution and the laws. If, being notified the second and third time, those ladies refuse to appoint arbiters for the corresponding indemnification of the lands which are to be taken for ejidos, the ayuntamiento will proceed to their occupation and survey without citing them further. Should the parties or their heirs hereafter ask for the indemnification of their lands, and be willing to name an arbiter, as required in the 13th article of the constitution of this state, a new measurement shall be made, if they desire it, and the land they asked for before shall be given them as a recompense. This resolution shall be communicated to the government, in order that, acting in accordance with it in the present case, it may serve as a general rule in all others that may occur, until a basis to be observed may be established by law." The effect of this decree is much controverted by the parties. The plaintiff insists that it was an adjudication in rem for the expropriation of the lands without compensation to the owners, if they continued recalcitrant, reserving to them, however, a right to obtain compensation at any future time by applying therefor. The defendants insist that it merely authorized a user of the lands without expropriation, until the parties chose to accept the terms proposed by the government. The validity of this decree we are not at liberty to question. It was an act of the highest tribunal known to the laws of Tamaulipas—a tribunal invested with supreme judicial as well as legislative authority. It does not belong to us to say that its acts or decrees were unconstitutional. Houston v. Robertson, 2 Tex. 25–28. So far as we are concerned, it was sole judge of its powers, and its acts must be accepted by us as having undoubted validity. The true construction and effect of the decree are alone to be sought by us. To arrive at these, we are authorized to look at all the circumstances of the case, the conduct of the parties, the government's own views on the subject, and any other light within our reach.

The most obvious view of the question, as it first presented itself to my mind, was this: That as the land owner refused to avail herself of the privilege accorded to her by the constitution, the legislature could authorize the taking of the land without compliance with the condition of first making compensation, and that this was what the legislature did; that the taking which ensued was followed by all the incidental rights and transfer of title which accompany a taking in any case; in other words, that the expropriation was complete, but the party had a reserved right to claim indemnification whenever she chose to ask for it and comply with the constitutional requisition. The district judge took a different view, and held that the occupation authorized by the decree was a mere usufructuary one, liable to be terminated in case of failure to make due compensation, when it should be asked for, and not ripening into title until such compensation should be made. The language of the decree, compared with that of the constitution, lends force to this view. The word used in the constitution is "property" (propiedad); the word used in the decree is "occupation" (occupacion). These words seem to have about the same distinction in the Spanish law as in the English. One indicates title; the other mere possession and use. Occupation is possession. It confers title where no owner existed before, or where the former owner had abandoned the thing occupied. But where an ownership or dominion already exists, it amounts only to possession and use.

The city authorities of Matamoras proceeded to treat the land as ejidos, granting a large number of labors, or town holdings on it; but the question of indemnity would

not be laid. It was agitated until the death of Madame Cavazos, in 1835, and afterwards until the United States took possession of the country in 1848, up to which period the state of Tamaulipas continued to exercise de facto jurisdiction over the country. In 1831, the matter was brought to the attention of the general government again, which, on the 29th of June in that year, made an order that the ayuntamiento of Matamoras should give information respecting the state of the affairs of the ejidos, and directing the first alcalde to order the owners of the land to present themselves at the capital, Victoria, in person or through an agent, within a reasonable time, to be named, so that, hearing the attorney general of finance, the indemnification to all might be agreed upon. In 1834, this order was served by the city authorities on the owners a second time, notifying them that this would be the last notice, and, if they did not appear, they would suffer the damages of the law for interposing obstacles in so important an affair. All this seems to indicate on the part of the city a conviction that its title was not entirely beyond dispute, and needed further support, and on the part of the government a like view of the case. The answer of Madame Cavazos to this summons is given in evidence. She was told to appear before the supreme government and present the titles of the property, in order that the dimensions of the ejidos lands which affected her might be determined. She declined to go or send, giving as an excuse that she was too old, but said in substance that she would receive her indemnification in money, and would submit to whatever the government might order. This is her last appearance on the scene. No evidence is given to show that any money was ever paid, or that any mode of estimating the amount due, different from that required by the constitution, was ever devised by the government. The defendants show some supplementary proceedings taken in 1841, for a resurvey of the ejidos, in which the Cavazos family were represented, and, it seems, acquiesced. But the survey was not satisfactory to the town authorities, and they refused to receive it, although they had ordered it.

The defendant also offers in evidence certain proceedings which took place before the state congress in September and October, 1848. The nature and object of these proceedings were not distinctly explained to us during the reading of the evidence, and we held them under advisement. We have since examined them, and find them to be this: After the treaty of Guadalupe Hidalgo, which was signed May 30, 1848, the Mexican authorities yielded all claim to jurisdiction east of the Rio Grande. Thereupon the city authorities of Matamoras proposed to sell out to private parties—speculators from the United States—the ejidos of the city on the Texas side. John Treanor, one of the now defendants, representing the Cavazos family, and particularly Dona Josefa, one of the defendants, applied to the general government for an injunction (or what is equivalent thereto) to prohibit the ayuntamiento from making any such sale, on the ground that it had no right to do this, and that it would injure the owners. The ayuntamiento put in an answer, setting up the claim of the city. The matter was presented to the congress of Tamaulipas, who referred it to a committee, and that committee made an elaborate and able report, in which they take the ground that, as compensation had never been made, which they held to be an indispensable requisite, the right of property was never perfected, and that as no expropriation could now be made, in consequence of the change of government, the original owners were entitled to receive back their lands, and were not confined to compensation; that alienation of the lands would not be a public use, but a private speculation. They say "the right of expropriation has another and more noble origin; its object is not to increase the receipts of the public revenues, but to provide for the well-being of the community." They add that it might also produce complications with the government of the United States of the North, which would, perhaps, justly contend that property belonging to a municipal body must be considered as public property. Hence, the committee recommended the congress to adopt a resolution to the effect that, it being provided by the 13th article of the former constitution and the 71st article of the present that in no case can expropriation be made without previous compensation; and this not having been made as to the ejidos, situated on the left bank of the Bravo, the ayuntamiento of Matamoras has not acquired a right of property in that portion, and consequently its former owners preserve it. This resolution was adopted by the congress on the 20th of October, 1848. We reject these proceedings as evidence of any res judicata binding on the parties in this case, because the congress of Tamaulipas had ceased to have any jurisdiction over the land in question. But as an authority on the law of that state, and as bearing upon the construction and effect of the decree of October 15, 1827, it possesses the highest value. The congress had jurisdiction of the parties before it, and of the subject matter. The city of Matamoras proposed to make a sale and conveyance which would have greatly injured and embarrassed the owners of the Cavazos title, by casting a cloud upon it, and perhaps inciting litigation. They applied to the supreme government for relief, and that government decided against Matamoras. It is a decision of the legal question on a case properly made, and, as such, it is worthy of great respect at our hands.

In the light of this decision, and of the other transactions which took place after the decree of October 15, 1827, we are brought to the conclusion that the decree and the proceedings under it did not have the effect to transfer to the city of Matamoras the title to the lands.

But if we are wrong in this conclusion, there is another point that is fatal to the claim of the plaintiff. As a corporation, the existence of the plaintiff commenced with the act of incorporation, passed February 7, 1853, and it has never received from any source the title of Matamoras, if such title had been outstanding, and hence, not having any title of its own to stand on, it must fail in this action. The only title on which it relies is its charter. But that confers no title. It confirms to the citizens of Brownsville, as incorporated by the act, all property, rights in action and claims to property which were held, owned, occupied and enjoyed by the citizens of said city under the previous charter of 1850, which had been repealed, but it confirms nothing and grants nothing to the corporation of Brownsville. The first charter did; it relinquished to the corporation all the right, title and interest of the state in and to the land that was owned by the town of Matamoras on the 19th of December, 1836. But this charter was repealed on the 1st of March, 1852, and with it the estate, if any was acquired, reverted to the state of Texas. But on the supposition that on the 19th of December, 1836, there was an outstanding estate in the city of Matamoras, in virtue of the expropriation proceedings, that estate, according to the weight of the later authorities, would revert to the original owners of the land when the purpose of the expropriation became incapable of further accomplishment, or ceased to exist. Expropriation is a seizure of so much of the owner's property as is necessary for the public purpose. A seizure of more, by adverse proceedings, would be an abuse of the power. It follows, therefore, that when the purpose is accomplished, or has ceased to exist, the residue of the property belongs to the original owner. But this reverter must be subject to any bona fide rights that may have lawfully accrued in the meantime. If the citizens of Brownsville, as holders of labors, acquired a right of perpetual occupancy at a certain rent, or any higher degree of title, they could not be deprived of it. And this was probably what was intended to be expressed in the charter of 1853. The question whether any rights of beneficial ownership, requiring the constitution of a trust for their support, existed in the citizens of Brownsville, as a body, by virtue of the charter of 1850, after its repeal, was brought before the supreme court of Texas in the case of Bass v. Fontleroy, 11 Tex. 698, and the court held that all lands held by the city for public purposes were liable to be disposed of by the legislature; and that all grants and trusts

created by the first charter were extinguished by its repeal. But the individual citizens, as such, might have rights which were valuable, and which ought to be restored to them. This is all that was done by the new charter of 1853. We are of opinion, therefore, that the state did not convey any property to the present corporation of Brownsville, even if it had any to convey; but we are also of opinion that the state had nothing to convey, as derived from the corporation of Matamoras. The conclusion follows that the defendants hold the title of the property in dispute under the Garza grant of 1781, duly confirmed by the act of 1852.

The plea of res judicata we do not think can be sustained. It is true that Basse and Hord, the parties under whom the heirs of Stillman and Hale claim, brought suit for the same property now defended for by them against the city of Brownsville in 1854, and a decision was rendered in favor of the city by dismissing the suit on the 27th of June, 1872, and no suit was brought by Basse and Hord, or the defendants, Stillman and Hale, within the year required by the statute of Texas; but they have a sufficient excuse for not bringing it. The city, within ten days after the termination of that suit, instituted this suit against them for the self same property. In our judgment, this dispenses with the necessity of the defendants bringing a suit. The reason for it ceases. The object of the statute is, if parties are not satisfied with the result of one action, to compel them to relitigate the matters without unnecessary delay, and a year is fixed for the purpose. But the defendant in the former suit, the successful party therein, itself commenced the relitigation almost immediately. The object of the statute was answered, and it would be promoting unnecessary and vexatious litigation to require the present defendants to bring a suit also. And, even if a plea of reconvention were necessary in order to satisfy the equity of the statute, we think that such a plea has been put in—not full and clear at first, but rendered so by amendment afterwards—which it was within the discretion of the court to allow. As to the pleas of prescription, we think that, under the circumstances of this case, the mixed possession that has ever existed, the continual contest of the parties, the pending of litigation from 1854 to the present time, and the absence of actual possession by either party over a great portion of the property, no prescription can be claimed, and the decision of the case must rest on the documentary title.

Our decision is in favor of the defendants, as follows:

We find against both parties in fact, on the issues of prescription; and, as a matter of law, we find for the defendants on the question of title, namely, that the defendants are seized in fee of the respective parts and portions of the lands claimed by the petition, for which they respectively defend, and that

the plaintiff is not so seized; and, as a consequence of this finding, we also find the defendants not guilty, as they have severally pleaded; subject, however, to the disclaimer filed by the defendants—the lands and premises disclaimed not being embraced in this judgment. And we give judgment for the defendants, that they severally recover the said lands in the parts and portions respectively claimed by them in the pleadings in the cause, and that, as to the action and demand of the plaintiff, they go thereof without day, and recover their costs.

[NOTE. The plaintiff brought error to the supreme court, which affirmed the decision below, agreeing with the holding of the circuit court as to the validity of the proceedings taken for the expropriation of the premises assigned to Matamoras as common lands or ejidos, and assigning, as grounds for such affirmation, that the decree of the congress of Tamaulipas merely authorized the use of the lands without expropriation until indemnification to the owner should be made as proposed by the government, and that the resolution of the congress declaring that the corporation of Matamoras had not acquired any property in the ejidos in question, but that they were reserved to their ancient owners, while not binding on the state of Texas or prior purchasers or alienees of the corporation, was an interpretation of the meaning of the constitution and former decree of the state of Tamaulipas, which the court should respect as a decision touching the law of that state; and also that the Texas statute giving the dissatisfied party a right to a second trial did not bar the defendants from setting up their claim in a suit against them respecting the same land brought within the required period; and, further, that under the circumstances no prescription could be claimed, the rights of the parties depending on the documentary evidence of title. City of Brownsville v. Cavazos, 100 U. S. 138.]