## BROWNSVILLE *v.* CAVAZOS.

1. By the laws of Mexico in force in 1826, a pueblo or town, when recognized as such by public authority, became entitled to certain lands, which to the extent of four square leagues, embracing its site and the adjoining territory, were to be measured and assigned to it.

2. By the Constitution of Tamaulipas, one of the States of Mexico, in force in 1826, the land of an individual could not be expropriated — that is, divested of its private character — for an object of common recognized utility, without previous compensation, the amount of which could be estimated only by arbiters appointed by him and the State. If such compensation was not made, though the failure to make it was caused by his refusal to appoint an arbiter, his title was not divested, and he and his grantees could recover the land after the jurisdiction over the country had been transferred by the treaty of Guadalupe Hidalgo.

3. By the law of Texas, a judgment against a plaintiff in an action for the possession of lands is conclusive, unless he commence a second action within a year. *Held*, that, in an action for the same lands commenced within the year by the former defendant against the grantees of the former plaintiff,

the latter are not precluded by that judgment from setting up their claim to them.

4. Where, up to the commencement of the action, a mixed possession of the land, and a continued litigation respecting it, existed, and there was no actual occupation of a large portion of it, — *Held*, that no prescription could be maintained by either party, and that the case must be determined on the documentary evidence of title.

ERROR to the Circuit Court of the United States for the Eastern District of Texas.

The facts are stated in the opinion of the court.

*Mr. Thomas J. Durant* for the plaintiff in error.

*Mr. James R. Cox* for the defendant in error.

MR. JUSTICE FIELD delivered the opinion of the court.

This is an action for the possession of certain real property in Brownsville, a city of Texas, situated on the left bank of the Rio Grande, opposite the town of Matamoras. Previous to the revolution which separated Texas from the Republic of Mexico, Brownsville constituted a portion of Matamoras, which was recognized as a town in 1826 by a decree of the congress of Tamaulipas, one of the States of Mexico. By the laws of Mexico in force at the time, pueblos or towns, when recognized as such by public authority, became entitled for their use and benefit, and the use and benefit of their inhabitants, to certain lands embracing the site of such pueblos or towns and adjoining territory, to the extent of four square leagues. This right was held by the cities and towns of Spain for a long period before her conquests in America, and was recognized in her laws and ordinances for the government of her colonies here. Laws of the Indies, in White's Recop., vol. ii. 44; *Townsend v. Greeley*, 5 Wall. 326; *Grisar* v. *McDowell*, 6 id. 363; *The Pueblo Case*, 4 Sawyer, 563. By them provision was made for the measurement of the lands, and their assignment to the pueblos or towns, when once they were officially recognized. If any portion of the lands which fell within the four square leagues, laid off in the usual way in a square or oblong form, had previously become vested in private proprietorship, authority was sometimes given to take the necessary proceedings to divest the property of its private character — to expropriate it, as it was termed — and subject it to the uses of the town.

Such was the case here. The four square leagues measured off and assigned to Matamoras crossed the Rio Grande and embraced the site of the present city of Brownsville, which was then the private property of one Dona Maria Francisca Cavazos. The premises were a part of a tract called the Espiritu Santo tract, granted by the Spanish government, in 1781, to one De la Garza. The grant was recognized as valid by the legislature of Texas in 1852, when it relinquished to the heirs and assignees of the grantee all the right and interest of the State therein. For the expropriation of the premises thus embraced within the limits of the land assigned to the municipality proceedings were taken soon after the town was established, in 1826. For some years immediately preceding their institution, Madam Cavazos was seised of the Espiritu Santo tract by regular deraignment of title from the grantee; and so continued until her death in 1835, unless she was divested of that portion assigned to the town by the proceedings for its expropriation. She devised the tract to three parties, one of whom is the defendant, Dona Josefa Cavazos, who, on partition with the others, became seised of that part which includes the premises in controversy, portions of which she conveyed to persons from whom the other defendants derive their title to the parcels which they severally claim.

The principal inquiry, therefore, presented for our consideration relates to the validity of the proceedings taken for the expropriation of the premises assigned to Matamoras as common lands — or *ejidos*, as they are termed in the Spanish language — on the left bank of the Rio Grande. And on this point we can add nothing to the clear and satisfactory exposition of the law contained in the opinion of the presiding justice at the circuit. We can do little more than repeat his argument and adopt his conclusions. *The City of Brownsville* v. *Cavazos*, 2 Woods, 293.

After the separation of Mexico from the mother-country, the several States composing the republic formed new constitutions of government, retaining the old Spanish laws so far as they were applicable to their new condition. The State of Tamaulipas, which embraced territory on both sides of the Rio Grande, in 1825 adopted a constitution containing an article

which declared that "neither the Congress nor any other authority shall be able to take the property, even that of the least importance, of any private individual. When it shall become necessary for an object of a common recognized utility to take the property of any person, he shall first be compensated upon the examination of arbiters appointed by the government of the State and the interested party."

Under this article, in order to divest the title of Madam Cavazos to the property taken, it became necessary to make to her compensation ; and its amount could only be determined by arbiters, of whom one was to be chosen by her. But she declined to appoint an arbiter, or to participate in the proceedings. She desired to retain the farm occupied by her, from which she drew her support, and specially wished that it should be reserved from the *ejidos* or common lands. Various efforts were made for more than a year to induce her to act in the matter, but she persistently refused. Finally, in October, 1827, the Congress of the State interfered, and by its decree declared that the government, in the exercise of its powers, would see that the civil authorities of Matamoras compelled her to obey the Constitution and laws ; that if, on being notified a second and third time, she should refuse to appoint an arbiter for the appraisement of her lands, which were to be taken for the town, the common council should proceed to their occupation and survey without further citation to her; and that should she or her heirs afterwards ask for indemnification, and be willing to name an arbiter, a new measurement should be made if desired, and the land she asked should be given to her.

It is upon this decree that the plaintiff, The City of Brownsville, relies to sustain its case, contending that the decree was an adjudication *in rem* for the expropriation of the property without compensation to Madam Cavazos, if she persisted in her refusal to name an arbiter, reserving, however, to her the right to claim compensation at a subsequent period upon complying with the law. On the other hand, the defendants insist that the decree merely authorized the use of the lands without expropriation until indemnification to her should be provided, as proposed by the government.

The presiding justice at the circuit was of opinion that the

court was not at liberty to question the validity of this decree, but must regard it as an act of the supreme authority of the State, in its dealings with its citizens, and that the inquiry of the court was, therefore, limited to its meaning and effect. This doctrine may, perhaps, be subject to some qualification, as the Congress of Tamaulipas was restrained by a written constitution.. But assuming that even a partial expropriation — a temporary possession of private property without compensation, in the case of an obstinate owner refusing to appoint an appraiser of its value — was permissible, we are of opinion that the position of the defendants is the only tenable one, and for several reasons.

In the first place, absolute expropriation was forbidden by the Constitution of Tamaulipas, without previous compensation. Until that was made, private ownership of the property was not divested. The State could have resorted to coercive measures to compel the owner to appoint an arbiter to act with its own appointee in estimating the amount to be paid. The decree states that the government would use its powers for that purpose, but it does not appear that any such measures were adopted. Its efforts did not go beyond a solicitation to her to act in the matter, and a summons in 1834 to all owners of lands within the *ejidos* to attend at the capital, " so that hearing the attorney-general of finance the indemnification to all might be agreed upon." Madam Cavazos declined to attend upon this summons, giving her old age as an excuse, but stating that she would receive her indemnification in money, and submit to whatever the government might order. It does not appear what action was then taken by the government. There is no evidence that any money was ever paid to her for the property, or that any mode was ever devised for appraising its value, other than that prescribed by the Constitution.

In the second place, the action of the Congress of Tamaulipas in 1848 upon this subject is persuasive, if not conclusive, evidence of the intent and meaning of the decree.

By the treaty of Guadalupe Hidalgo, ratified on the 30th of May, 1848, the Rio Grande was acknowledged to be the boundary between Mexico and the United States, when, of course, the jurisdiction of Tamaulipas over the premises in controversy

ceased.  But rights of private property previously existing in the territory east of the Rio Grande were in no respect affected. If they had arisen before the independence of Texas, their validity was to be determined by the laws of Mexico or Tamaulipas then in force.  The authorities of Matamoras, claiming the *ejidos* under the decree in question, and believing that after the treaty it would be difficult to enforce contracts with respect to the lands east of the Rio Grande, proposed to sell those now in controversy to various parties from the United States.  Thereupon one John Treanor, representing the Cavazos family, and particularly Dona Josefa, one of the defendants in this suit, applied to the congress of Tamaulipas for protection, —in effect asking that the municipality be restrained from making the contemplated sale, on the ground that it possessed no just claim to the property, and that such action would be of serious injury to the owners.  To this application the common council of Matamoras replied by setting up the claim of the city.  The matter was then presented to the congress, and referred to a committee, who gave to the subject extended consideration, and finally made an elaborate report to the effect that compensation had never been made to the owners of the property; that such compensation was an indispensable requisite to its expropriation; and as such expropriation could not now be made in consequence of the change of government over the country, they were entitled to receive back their lands, and were not confined to compensation; and that the alienation of the lands by the city under these circumstances would not be subjecting them to a public use, but disposing of them for purposes of speculation; adding, that the right of expropriation had another and more noble origin, its object being not to increase the public revenues, but to provide for the wellbeing of the community.  The committee further suggested that the alienation might produce complications with the government of the United States, as the latter would probably contend that, if the lands belonged to the municipality, they must be considered as public property.  The congress therefore passed a resolution to the effect that as article thirteen of the ancient Constitution of the State and article seventy-one of the then existing Constitution prescribed that in no case

could an expropriation be established without previous compensation, and as this had not been made for the *ejidos* situated on the left bank of the Rio Grande, the corporation of Matamoras had not acquired any property in them, and that in consequence they were preserved to their ancient owners. This resolution bears date the 20th of October, 1848. As between the city of Matamoras and the applicants it is conclusive; the congress had jurisdiction of these parties; neither questioned its power, and both accepted its judgment as a finality.

Although this resolution may not bind the State of Texas, or previous purchasers or alienees of Matamoras, it is entitled to the highest consideration and respect as a decision touching the law of Tamaulipas, and as an interpretation given to its Constitution upon the expropriation of private property, and to its own previous legislation. It accords with the obvious and natural meaning of the decree of 1827, which only proposed to allow the city to occupy the lands in advance of compensation, and it is supported by all the attendant and subsequent circumstances of the transaction. We therefore adopt it as at once a just and reasonable disposition of the matter.

This conclusion renders it unnecessary to inquire as to the possible interpretation which the language of the charter of Brownsville might receive, or what rights that city might have had, if Matamoras had held property on the east bank of the Rio Grande which, upon the independence of Texas, passed either to her successor or to the State.

It remains only to consider the pleas of *res judicata* and prescription interposed by the plaintiff in bar of the title set up by the defendants.

It appears that certain parties by the name of Basse and Ford, under whom some of the defendants trace their title, brought suit for the property now claimed against the city of Brownsville, which resulted in a judgment of dismissal in June, 1872; and a new suit under the law of Texas was not brought by them within one year afterwards. By that law a judgment against a plaintiff in an action for the possession of real property — or an action of trespass to try the title, as it is termed in the law — is conclusive unless he commence a second action for the property within a year. But the answer to the objec-

tion that the judgment here is conclusive against the defendants is, that before the year elapsed, and indeed within ten days after the dismissal, the city commenced the present suit for the same property, in which all their rights were again brought into litigation. The law which gives to the dissatisfied party a right within one year to re-litigate a second time a controversy respecting land in Texas, does not bar him or his grantees from setting up his or their claim, if within the required period a similar suit respecting the same land is commenced against him or them by the former defendant. The object of allowing a second litigation of the same title, and of requiring such litigation to be speedily instituted, is equally accomplished.

As to the plea of prescription, we agree with the court below that, under the circumstances, the mixed possession of the parties, their continued contest and litigation from 1854 to the present time, and the absence of actual possession by either of a large portion of the property, no prescription can be claimed, and that the case must be determined on the documentary evidence of title.

We are satisfied with the conclusions reached by the Circuit Court, and its judgment is in all respects

*Affirmed.*