.No. 2450.

**TEXAS MEXICAN RAILWAY COMPANY *v.* S. M. JARVIS ET AL.**

1. **PUBLIC DOMAIN.**—Land included within the bounds of a grant emanating from the government of Spain in 1767, and situated in Texas, is not subject to appropriation by land certificates issued by the State.

2. **FOUNDING OF LAREDO.**—The town of Laredo was founded in 1767 by a commission appointed by the Marquis of Croix, then Viceroy of New Spain.    That commission apportioned the lands that should be held in common, surveyed the town, apportioned the land to be held in private right, designated the grounds for public use, fixed the town *exidos*, provided for the organization of municipal government, and established *porciones* of land outside of the *exidos* for the benefit of such as might receive them.

3. **LOCATION OF LAREDO IN 1767.**—The *visita general* of that commission shows that sixty-four *porciones* were then surveyed, and that the town of Laredo was located on both sides of the Rio Grande, on lands then presumably within the then province of Nuevo Santander.

4. **PREAMBLE TO ACT OF LEGISLATION.**—The preamble to a legislative act may be looked to in order to ascertain, when doubtful, the general purpose of the act, and may be regarded as the legislative declaration of the existence of a fact therein recited.

5. **SAME.**—The preamble to the act of April 24, 1871 (Paschal's Digest, page 1191), reveals its general purpose to have been to obtain and preserve evidence of at least the extent of old grants in the localities mentioned in the act, which were not archived in the general land office, and which the Legislature did not believe could be obtained elsewhere than in the archives at Laredo and the other towns mentioned in the act.

6. **CASE REVIEWED.**—The decision in the State vs. Cuellar, 47 Texas, was rendered before the adoption of the Revised Statutes and under a rule of evidence more restrictive as applicable to archives than that which now exists.

7. EVIDENCE—COPIES.—The copy of a testimonio of the *visita general*, which was certified to by the mayor of Laredo under the seal of the corporation and deposited in the General Land Office by J. L. Haynes, who was appointed under the act of April 24, 1871, is such a paper as the Commissioner of the general land office may properly certify to, and under art. 2253 (Revised Statutes) is admissible in evidence in all cases in which the original protocol of such *visita general* would be admitted. That copy, so far as preserved, was authenticated as such instruments were required to be, by the laws then in force; it had all the force and was entitled, under the facts referred to in this case, to all the faith given to authentic instruments.

8. SAME.—The legislature which required the transcripts of the archives on the Rio Grande towns mentioned in the act of 1871, having been passed with a knowledge that the protocol of the *visita general*, under the laws in force at the time, was deposited in the City of Mexico or at Guadalahara, and that a copy only was left to serve as an archive in the local municipality, it must be presumed that it was the intention to make such transcripts evidence of every fact that could be shown by the papers from which they were copied.

9. EVIDENCE.—After the lapse of a hundred years the *visita general* found archived at Laredo, under which rights had been acquired and recognized continually, can not be invalidated as evidence, because of the fact that a few of the original leaves are missing; the presumption will prevail that they were executed with the same regard to the laws in force, that is observed in that portion which is preserved.

10. EVIDENCE—CONSTITUTION CONSTRUED.—The fourth section of article thirteen of the State Constitution, which, among other things, excludes as evidence of title to land any claim originating prior to the thirteenth of November, 1835, which has not been recorded in the county or archived in the general land office has no application to the transcript of the *visita general* of 1767 concerning the city of Laredo, deposited in the land office before the adoption of the constitution. Nor is the admissibility in evidence of copies from the land office of such transcripts affected by article fifty-eight of the Revised Statutes.

11. CONFIRMATION BY VICEROY.—Whether the laws in force in 1767 required a confirmation by the viceroy of the grants made at Laredo in that year, may be involved in doubt. A confirmation by the viceroy of grants made by the sub-delegates at Laredo in 1767 will be presumed after so great a lapse of time, during which title has been openly asserted under such grants and possession maintained.

12. JUDGMENT—EVIDENCE.—The fact the judgment was rendered against a claimant who sued under the act of August 15, 1870, does not establish prima facie against such claimant, the fact that the title never passed to him from the former government.

APPEAL from Webb. Tried below before the Hon. J. C. Russell.

*Thos. W. Dodd* and *Coopwood & Son*, for appellant: That the

presumption of a grant can never fairly arise where all the circumstances are consistent with the non-existence of a grant; nor where the claim is of such a nature as is at variance with the fact of a grant; and it can not be raised upon an inchoate or imperfect grant; and it is repelled by a failure to prove the genuineness of the document under which the party claims, and if the party does not allege a grant, and lay the proper foundation in his pleadings for the proof of one, the presumption of a grant can not be indulged; they cited, Watkins v. Taylor, 26 Texas, 688; Paschal v. Perez, 7 Texas, 348; Miller v. Bronnson, 50 Texas, 583; Dangerfield v. Paschal, 11 Texas, 579, 582; Luco v. United States, 23 Howard, 543; United States v. Rose, 23 Howard, 273; Palmer v. United States, 24 Howard, 131; United States v. Castro, 24 Howard, 352.

The correct finding of fact arising from the evidence, is, that the proceedings had in the two suits in the district court of Travis county amounted to a final determination of the claims of the plaintiffs therein to the lands in question, and left the same as part of the public domain, fully discharged of and from all claim of right or title thereto on the part of the plantiffs in that suit, who are defendants herein; citing, State v. Cuellar, 47 Texas, 302-306.

An absolute nullity, as a void deed, judgment, etc., will not constitute color of title, and this instrument, the admission of which is complained of in this first assignment of error, when viewed in the light of the law, which must be noticed by everybody, can not be used as the color of title to shield the defendants; citing, Bernal v. Glein, 33 California, 676; Jackson v. Woodruff, 1 Cowan, 276; Jackson v. Frost, 5 Cowan, 583; Jackson v. Waters, 12 Johnson, 365; Levingston v. Peru Iron Company, 9 Wendell, 511; Walker v. Turner, 9 Wheaton, 541-552; Moore v. Brown et al., 11 Howard, 425; Linsey v. Miller, 6 Peters, 666-676; Galaway v. Finley, 12 Peters, 299; Hanrick v. Dodd, 62 Texas, 91; Jackson v. Ingraham, 4 Johnson, 182; State v. Delesdenier, 7 Texas, 76; Mason v. Russell's Heirs, 1 Texas, 721; Todd v. Fisher & Miller, 26 Texas, 241.

*McLane & Atlee* and *McCampbell & Welch,* for appellees: All papers appertaining to the lands of the Republic or State of Texas, that have been deposited or filed in the general land office in accordance with any law of the Republic or State of Texas,

are archives; and a translation and transcript of the charter
or *visita general* of Laredo, made under the act of twenty-fourth
April, 1871, certified to be correct by the authorities thereof, is
properly on file in the general land office, and a certified copy
by the Commissioner is admissible. (2 Pas. Dig., art. 5826; Rev.
Stats., art. 57, sec. 5; id., arts. 2252, 2253, 2259; Hall's Mex. Law,
chap. 7.)

STAYTON, ASSOCIATE JUSTICE. This action was brought by the
appellant to obtain a writ of mandamus to compel Jarvis, who
was the surveyor of Webb land district, to receive applications
to locate lands, claimed to be unappropriated public domain, by
virtue of land certificates of which the appellant was owner,
and to compel him to make and return surveys. The persons
claiming to be the owners of the lands which the appellant thus
sought to appropriate, were joined as defendants with the sur-
veyor.

The defendants denied that the lands which the appellant
sought to appropriate were of the unappropriated public domain,
and alleged that they were granted by the government of Spain,
in the year 1767, to Lauriano Salinas, Jose Antonio Dias and
Jose Bartolo Chapa, through whom they severally claim the
land. To the answer setting up this defense, a demurrer was
filed, and, on hearing, it was overruled. There was no error in
this ruling, for if, as alleged, valid grants of the land were
made by the Spanish government while it had the ownership
and dominion of the land, it was not subject to appropriation
under the land certificates owned by the appellant.

Jarvis ceased to be the surveyor pending the action, and his
successor was made a party defendant, and it may be conceded
that all the necessary parties were before the court to warrant
a final adjudication of the questions involved. The cause was
tried without a jury, and resulted in a judgment for the defend-
ants. The assignments of error relate to the admission of evi-
dence and the conclusions of fact and law found by the court,
and they will be considered in so far as deemed necessary for
the decision of the material questions involved in the case.

On April 24, 1871, an act entitled "An act to provide for the
obtaining and transcribing of the several acts or charters
founding the towns of Reynosa, Camargo, Mier and Guerrero,
in the republic of Mexico, and of Laredo in Texas, and making
an appropriation for that purpose," was passed. (Paschal's

Digest, p. 1191.)   The preamble and first section of that act are as follows:

"Whereas, many of the lands on the east side of the Rio Grande were originally granted by the supreme government of New Spain by good and valid grants; and whereas, many of said lands have been abandoned, and have escheated to the State of Texas, and become a part of the public domain of the State; and whereas, there is not in the general land office, or elsewhere in the State of Texas, any evidence of the extent of said grants, and the same is only to be found in the archives of the towns mentioned in the caption of this act; therefore,

"1.   The governor is hereby authorized to appoint a suitable person, understanding the Spanish language, whose duty it shall be to proceed to the towns of Reynosa, Camargo, Mier and Guerrero, in Mexico, and to Laredo in Texas, and obtain from the authorities of said towns access to the archives of the same, and make a correct and accurate transcript and translation of all the acts, charters, or grants affecting the lands on the east side of the Rio Grande, and who shall obtain from the said authorities a certificate as to the correctness of said transcripts, which, together with the translation, shall be filed in the general land office." (Paschal's Digest, 5826.)

In pursuance of this act, J. L. Haynes was appointed to perform the duties prescribed by it.   This he did, and, in December, 1871, he filed in the general land office a paper certified to be "a correct and verbatim copy of the original 'general visita,' with all the corrections and amendments as existing in said 'visita,' which is now on file in the archives of this municipality," which was certified by the mayor of Laredo under the seal of the corporation.   The agent of the State also filed a translation of that paper, as required by the act.   The paper so filed purports to be a record of the proceedings of a sub-delegation or commission in founding the town of Laredo, which was composed of Juan Fernando Palacio, lieutenant captain general of the province of Nuevo Santander, and Jose d Osorio y Llamas, secretary of the royal councils, both commissioned by the Marquis of Croix, then viceroy, governor and captain general of New Spain, which begun its labors at Laredo on June 9, 1767, and continued there until some time after the twenty-fifth of that month, and each days proceedings purport to have been signed by the commissioners, the persons called upon by them,

and by the inhabitants to assist them, so far as those persons were able to write, and by assisting witnesses, as was required by the laws then in force.

After reciting, in effect, that in pursuance of royal orders and recommendations made in the year 1763, they came to establish the town, and to apportion to it lands to be held in common, and to its inhabitants lands to be held in private right, it evidences that the lands to be embraced in the town were surveyed, the town laid off with lots for public use and for private appro-. priation by the inhabitants, the *exidos* fixed, and provision made for the organization of the municipal government.

It further shows that outside of the land surveyed for the town and its *exidos*, lands termed *porciones* were surveyed so that they might be identified, and these were numbered, and one *porcion* set apart to each of the inhabitants who desired to and was entitled to have such lands.

The following appears as to *porciones* numbers thirty-four, thirty six and thirty-seven.

"34. Another survey was completed with twelve hundred varas on both fronts and thirty thousand in length. It was marked on the line of the commons and was left to Jose Antonio Diaz, who claimed it." * * *

"36. Another survey on the river bank with twenty cords, which marks one thousand Mexican varas, which with thirty thousand in length and one thousand on the opposite front, constitute it. It was left to Lauriano Salinas at his request.

"37. Another composed of one thousand Mexican varas, thirty thousand in length and one thousand on the opposite front. It was claimed by Jose Bartolo Chapa and it was left to him." * * * *

The locality of these, from other parts of the survey preceding, may be fixed.

This instrument shows that thirty-five *porciones* on this side of the river were set apart each to a particular person, but these were not in consecutive numbers, some of the *porciones* being left unappropriated but subject to future appropriation by incoming inhabitants, in accordance with instructions therein given, and, in reference to the thirty-five *porciones* set apart to named persons the instrument declares that "this makes thirty-five persons whose *porciones* they surveyed, marked and adjudicated as they have determined and stated in writing in every individual case."

Twenty-seven *porciones* on the other side of the river were surveyed and set apart to named persons, and, after all these things were done, the instrument has the following declarations: "We declare the adjudication of the sixty-four *porciones* respectively to the residing settlers of this town and its jurisdiction on this side and the other side of the river, in conformity to and in accordance with our decree of the thirteenth day, and as is stated by the surveyors to have been given to the parties interested at the time of the survey. Sixty-four *porciones* were given in fee simple, being occupied and taken by registered and enrolled persons; the remaining two *porciones*, numbered five and twenty-nine, on the other side of the river, taken by unknown (probably unregistered) parties not entered on the list, were given only in usufruct, under the following charges and conditions." These charges and conditions relate to the time within which persons receiving lots and *porciones* should take possession of them, and imposed a penalty of forfeiture on failure to comply, and it forbade a sale, exchange or alienation to a clergyman, or person prohibited by law to buy, under a like penalty; and it then declares that "a full certified copy of it (the decree), containing a literal transcript of all the proceedings in the premises, shall be kept for the security and protection of the parties interested, and deposited in the archives of the captain, and he shall personally (or in case of his illness or on account of his advanced age, through the lieutenant appointed by me, Don Juan Fernando de Palacio), shall proceed to establish lasting and conspicuous monuments in each one of said *porciones* and sites marked by the surveyors, in order to avoid all damage and injury to third parties." The instrument is very lengthy and full of details as to every act done, and seems to have been in accordance with the laws then in force regulating the establishment of towns and apportionment of lands to towns and their inhabitants. (Royal Regulations of October 15, 1754; 2 White's Recapitulation, 62; Liber 4, title 18, Laws, 2, 3, 4, 5, 8, 11, 12; 2 White's Recap., 48; Hall's Mexican Law, 17–38.) The instrument shows that the town was located on both sides of the Rio Grande, on lands then presumably within the province of Nuevo Santander.

A translation of the instrument shown to have been filed in the general land office by Haynes, made by the Spanish translator in the general land office, certified by him and the Com-

·missioner of that office, was offered on the trial, and admitted over the objections of the appellant, which were as follows:

"1.  It is incompetent and irrelevant.

"2.  It purports to be a certified translation of a copy of a copy of a copy, which has never been made, or authorized by law to become, an archive of the general land office of the State, and which is not, and if produced could not, be made an instrument of evidence, and which is not such as the Commissioner and translator of the land office are authorized to make a translation of, to be used in evidence.

"3.  It appears therefrom that its original, if it ever had such, was unexecuted and not signed by any officer or person whomsoever, and was and is inchoate and never vested any title to land in any person.

"4.  It does not describe or identify the premises in dispute, and is void for want of certainty, and it shows that no survey of the land was ever made to attach it to the land, or to separate the same from the public domain.

"5.  It appears therefrom that it is not a translation of an authentic document, and neither the execution, genuineness nor existence of its original has been proved.

"6.  It appears therefrom that its original, if it ever had such, was never approved by the king or viceroy, or by any other person thereunto authorized, and that no final title or composition was ever made or issued by virtue thereof.

"7.  It appears therefrom that its original was never proved or authenticated for record, and was never recorded in this State.

"8.  Its use as evidence in the courts of the country is forbidden by the constitution and laws of the State.

"9.  It has not been proved to be a true or correct copy, or translation, of any original, or copy of an original in the Spanish language, which objection was overruled by the court, and appellant duly excepted."

J. L. Haynes testified that he was the person appointed under the act of April 24, 1871; that the copy of the *general visita* which he filed in the general land office, was made by Tomas Flores, secretary of the city of Laredo, and that he compared that copy with the original *visita*, which was much worn, appearing to have been wet, and in places where not legible he compared it with an office copy used by the secretary, and that one or two leaves of the original were gone.   He further stated

that the paper of which he spoke as the *general visita* was in the same handwriting as other documents of a like character in Camargo, Mier and other towns on the Rio Grande. The non production of the paper spoken of as the original was accounted for. It was shown that as late as 1850 that paper was looked to to ascertain the true location of the several tracts of land described in it, and that actual surveys made at that time in accordance with it were found correct. As to this, Santos Benavides, after testifying that he thought only twenty-seven *porciones* given to the original settlers at the time of the foundation of the city of Laredo were then surveyed, stated that "about 1850 Trimble surveyed them all. I was with Trimble. He first surveyed the town tracts, or commons. Then he surveyed the six leagues above and the six leagues below town. He began at a well known monument above town at the first *porcione*. This monument had letters on it, and a date so old I could not read it. He then went in accordance with the *general visita* which he had with him, and he came out right. He found four corners of the tract, the lower one being at or near Dolores. Trimble surveyed *porciones* for those who applied to him, and made them right. He began at the old corners. He surveyed the *porciones* of my father, where the ranch of San Francisco is, and found the old corners just right."

*Porciones* 36 and 37, are claimed by Francisco and Victoriano Juarez, defendants, and the evidence shows they were occupied by Lauriano Salinas and Bartolo Chapa and their heirs before the beginning of the present century, and until the year 1812, when the heirs of named grantees conveyed their two *porciones* to the father of these two defendants, since which time their father and themselves have continuously occupied them, claiming them and paying taxes due thereon. Their old boundaries have been known at least sixty years.

*Parcione* 34 is claimed by the defendant Jarvis, who has been in possession of it under claim of title since the year 1867, but it is not shown how he deraigns title, though it does appear that he bought it and has a deed to it which has been recorded for twenty years. It also appears that "Jacinto Gonzales and a lot of heirs" also lived on it, but the period of their occupancy and under what claim of right does not appear.

The court found, and it is not controverted, that the land

which the appellant seeks to appropriate covers the land embraced in *porciones* 34, 36 and 37.

I. The first question that arises is: Was the instrument to which we have referred properly admitted in evidence?

While the preamble to the act of April 24, 1871, has not the force of a law, it may be looked to to ascertain the reasons which influenced the Legislature to enact the law which follows it, and to ascertain the general purpose intended to be accomplished by it; and it may be deemed the legislative declaration of the existence or nonexistence of a fact stated in it to exist or not to exist, the effect of which towards establishing a recited fact, however, need not, in this connection to be considered.

Looking to the preamble we see that the general purpose of that act was to obtain and preserve evidence of the extent, at least, of grants in the localities named, which was not in the general land office, and not believed by the legislature to be obtainable elsewhere than in the archives of the towns named in the act.

The legislature is not to be presumed to have been ignorant of the mode in which the former government, in founding new towns, made grants of lands to them to be held for common use and to the inhabitants of such towns to be held in private right; nor can the legislature be presumed to have been ignorant of the proper places for the deposit and preservation of the evidences of such rights to lands as were conferred on towns and their inhabitants in the early settlement of the country. Nor can it be supposed that the legislature was unaware of the fact that the same instrument which shows the extent of the thing granted, usually evidences the fact that the thing was granted.

What shall be evidence is largely subject to the legislative will, and for the purpose of ascertaining that, we will look to the legislation bearing on the question before us. Prior to the adoption of the Revised Statutes there was no law in force which expressly declared that instruments obtained and filed in the general land office by the State's agent, in pursuance of the act to which we have referred, should be considered archives; and for this reason, as well as others, which it seems to us would be entitled to more weight, it was held in the case of The State v. Cuellar (47 Texas, 306), that extracts from a copy of a paper somewhat like that before us but differing in many respects, though certified from the general land office, was not admissible

as evidence of title in an action for confirmation under the act
of August 15, 1871. That decision, however, was made prior to
the adoption of the Revised Statutes, and in a case founded on
a statute which required a mode for proof of title, much more
restricted than the rules of evidence applicable to the case be-
fore us impose.

The act which we have before set out declared, that the instru-
ments therein directed to be procured "shall be filed in the gen-
eral land office" and thus, when obtained in accordance with
the law and filed in that office it becomes their proper place of
custody and the commissioner of that office their proper custo-
dian. The word "archives," as used in the statutes of this
State, means public records and papers required or permitted
by law to be filed in public places of deposit for preservation
and use as evidence of facts. There were many laws in force
prior to the passage of the Revised Statutes requiring papers
affecting land titles to be filed in the general land office, but
these did not in terms say that the papers so required to be
filed should be deemed archives, yet such was their character as
fully as though this had been expressly declared.

Article 57, Revised Statutes, however, declares what shall be
deemed to constitute a part of the archives of the general land
office, as no former act had done, and, after enumerating many
things, provides in its fifth subdivision as follows:

"All other books, transfers, powers of attorney, field notes,
maps, plats, legal proceedings, official reports, original docu-
ments and other papers appertaining to the lands of the
Republic or State of Texas, that have been deposited or filed in
the general land office in accordance with any law of the Re-
public or State of Texas."

The instrument in question was in the general land office at
the time the Revised Statutes were adopted, and there can be no
doubt that it was a paper of which the Commissioner of that
office could certify a copy, or with the translator a translation of
it. The statute provides that: "It shall be the duty of the Secre-
tary of State, Attorney General, Commissioner of the General
Land Office, Comptroller, Treasurer, Adjutant General and
Commissioner of Insurance, Statistics and History, to furnish
any person who may apply for the same with a copy of any
paper, document or record in their respective offices; and also to
give certificates, attested by the seals of their respective offices,
certifying to any fact or facts contained in the papers, docu-

ments or records of their offices, to any person applying for the same; and the same shall be received in evidence in all cases in which the originals would be evidence." (Rev. Stats., art. 2253.) The preceding article provides for translations, and provides, when certified as provided, that they "shall be prima facie evidence in all cases where the original records would be evidence." If the word "originals," used in these articles, means any paper deemed in law an original, whether in the general land office or there evidenced by a copy authorized by law there to be filed, then it is clear that the instrument offered in evidence was admissible, unless irrelevant, for there can be no doubt that the original protocol, or the copy thereof deposited in the archives of the city of Laredo, under the facts of this case, would be admissible if produced without any proof of execution. If the word "originals" refers to the paper in the general land office, then the copy offered in evidence would be admissible under article 2252, Revised Statutes, which provides that "copies of the records of all public offices and courts of this State, certified to under the hand and seal (if there be one) of the lawful possessor of such records, shall be admitted in evidence where records themselves would be admissible."

The paper, from which the copy was taken that was filed in the general land office, was essentially a public record, belonging to and properly deposited in the archives of the city of Laredo. It was a paper directed there to be deposited, to evidence the fact of the foundation of the town; its municipal organization; the duties, powers and rights conferred upon it, and also the rights conferred on its inhabitants; it affected the rights of many people, and had been recognized and acted upon for more than fifty years, while the Spanish government had dominion over the territory; for about fifteen years, while the Mexican Empire and Republic had dominion, and for thirty-four years after the territory became a part of Texas, before the copy filed in the general land office was made; and during all this time, notwithstanding the notoriety of the claim, none of these governments ever questioned its validity or the rights of those claiming under it; but on the contrary, by the acts of September 4, 1850, and February 10, 1852 (Pas. Dig., arts. 4459–4461), claims under it were confirmed, and these, in many instances, confirmed titles to *porciones* by number and to the persons as fixed and as they appeared in the *general visita*.

The instrument, so far as preserved, was authenticated as

such instruments were required to be by the laws then in force, and had all the force, and was entitled, under the facts, to all the faith given to instruments authentic.

The Legislature must be presumed to have known that the protocol ought not to be found in the archives at Laredo, and that only a copy therefrom should be found there; for under the practice of the former government the protocol was required to be deposited in the archives at the City of Mexico if the land was within the jurisdiction of that audiencia, which seems to have been true, or at the City of Guadalajara if within that audiencia; yet, so knowing, the Legislature directed that transcripts should be made from the archives of the towns named "of all the acts, charters, or grants affecting the lands on the east side of the Rio Grande," and that these, by its agent, be filed in the general land office; and it ought to be presumed from this that the Legislature intended to make such transcripts evidence of such facts as the papers from which they were taken would legally evidence, notwithstanding the papers, in the archives named, were only the original copies given to the towns and their inhabitants as evidence of their rights, the protocols remaining in a foreign country.

Many instances have occurred in which papers other than protocols were required to be filed in the general land office, and thus become archives, and copies of such papers certified from that office, have been held admissible. (Huston v. Berry, 3 Texas, 393; Id., 5 Texas, 464; Paschal v. Perez, 7 Texas, 359; United States v. Delesdenier, 12 Peters, 654.

The evidence was not irrelevant. What has been said disproves of the first, second, fifth and seventh objections made to the introduction of this instrument.

II. The third objection is not tenable. The instrument, in so far as it was in existence, was executed in accordance with the laws then in force, each day's proceeding being separately authenticated, and the fact that one or two pages of it, after the lapse of more than one hundred years, were missing, furnishes no reason to induce the belief that the residue of the paper was not executed in the same manner as were the parts still existing. All parts of the paper, of which we have given the substance, except the very last were properly authenticated.

The objection is that it appears from the instrument offered that the original was never executed, and was inchoate. It shows no such fact, and in the face of what it does show, no

such presumption can arise. That one or two pages of the instrument in the archives at Laredo may have been missing, under all the facts in proof, furnished no reason for the exclusion of the copy of that which did exist, and at most, that fact would bear on the weight to be given to it rather than upon its admissibility. (Wooten v. Dunlap, 20 Texas, 184; Trimbletrom v. Kennons, 9 L. & F., 714; Wharton on Evidence, 631.) The effect of the instrument is for after consideration.

III.  The further objection urged that the instrument did not identify the premises in dispute, nor show that a survey of the land was made. An inspection shows that there was no foundation for these objections.

IV.  The sixth objection was that it appeared from the instrument that its original was never approved by the King of Spain or the viceroy, and that no final title ever issued; but no such facts appear from it; and the most that can be claimed from the face of the instrument is, that it does not affirmatively appear from it that the king or viceroy affirmed the acts of the sub-delegates, which it evidences.

V.  The seventh objection was, that the paper was never proved for and admitted to record as deeds are required to be by the laws of this State. This was not necessary.

VI.  The eighth objection was, that its use as evidence in the courts of this State is forbidden by the Constitution and laws of this State.

Article 13, section 4, does provide, among other things, that no claim of title or right to land, issued prior to the thirteenth day of November, 1835, which has not been recorded in the county where the land is situated, or not archived in the general land office, shall be used as evidence in any of the courts of this State, but that this shall not affect such rights or presumption as arise from actual possession. The claim asserted by the defendants was archived in the general land office prior to adoption of the present Constitution, and, hence, is not affected by it.

VII.  The ninth objection was, that the instrument had not been proved to be a correct copy or translation of any original or copy of any original in the Spanish language. For reasons before stated, no such proof, under the facts shown, was necessary. No objection was made on the ground that the State's agent did not file a true copy, nor on the ground that the copy was not certified in the mode contemplated by the statute.

VIII.   Article 58, Revised Statutes, provides that "nothing in the preceding article (the article we have quoted) shall be construed to give any of said books, records or other papers named in said article any greater force or validity by reason of their being so recognized as archives of the general land office, than was accorded to them by the laws in force at the date of their execution and deposit in the general land office." This does not affect the question of the admissibility of copies of the archives, when properly certified, if they relate to mat ters relevant to an issue to be tried.   If the archives be copies that would be admissible to prove the facts stated in them, then a copy certified from them is admissible and as effective as an instrument of evidence as would be the paper archived, if not as effective as would be the original to which all the copies of whatever grade refer.   The instrument offered in evidence, in so far as it purports to be a copy of the instrument executed in accordance with the laws in force at the time, unrebutted, proves the facts stated in it.

These facts, under the law in force in the month of June, 1767, vested in Lauriano Salinas, Jose Antonio Diaz and Jose Bartolo Chapa, title to the three *porciones* which it is admitted are covered by the appellants' applications, unless the confirmation of these grants by the viceroy was then necessary, as to which there may be doubt, if we consider all the provisions of the royal cedula of October 15, 1754, and especially the twelfth article thereof.   The same effect would be given to the same facts under the law in force when the copy of the *general visita* was filed in the general land office.

IX.   The court, in effect, found the facts as we have stated them, and thence held that the land was granted by the government of Spain in the year of 1767, and was, therefore, not subject to location.   The facts shown by the instrument to which we have before referred, show that all the steps necessary to the making of valid grants were taken, except, it may be, that the acts of the sub-delegates were confirmed by the viceroy. If the instrument were entire this fact most probably, if it were necessary to valid title, would appear; and, in view of the long possession and open assertion of title under it, and the failure of three governments for more than a century to deny the right asserted, we are of the opinion that it must be presumed that valid grants were made as the defendants claim; and that the acts of the subdelegates were confirmed by the

viceroy. The rules applicable to this question are well settled, and there is nothing in the facts of this case to deny their application.

X. Under the provisions of the act of August 15, 1870, the defendant, Victoriano Juarez, brought suit against the State for confirmation of titles to *porciones* numbers 36 and 37, and a judgment was rendered in his favor by the district court, but on appeal that judgment was reversed, and he subsequently dismissed his action without any final adjudication of his right. It is urged that these proceedings bar his right; we know of no rule of law under which such a proposition can be maintained.

XI. The defendant, Jarvis, also brought an action under that act for confirmation of title to *porcion* number 34, and there was a final adjudication against him. The act provided that "all lands, the claim to which shall be finally rejected in the manner herein provided, shall be deemed, held and considered as part of the public domain of the State." (Paschal's Digest, article 7075.)

The judgment against Jarvis could not make the land a part of the public domain if it was not so in fact.

It might operate to prevent his assertion to the contrary, but this would be the extent of its operation; and in view of the fact that under the act, which authorized the action prosecuted by Jarvis, title by prescription or by presumption raised by long continued possession under claim of right, was not sufficient to authorize a confirmation, we are of the opinion that the judgment against him ought not to be held to establish prima facie that the land was never titled by the former government. (The State v. Cardinas, 47 Texas, 251.)

Intimately connected as are all the proceedings tending to show a grant to the municipality of Laredo, and grants to those persons who were its inhabitants at that early day, we are of the opinion that long continued possession by the town and its inhabitants under claim of title through these proceedings, as well as the possession of any particular *porcione* should be looked to in considering whether a grant should be presumed; for the origin and rights of all are based on these proceedings.

Looking to all these facts, and to the possession of *porcione* 34, shown to have existed, we are of the opinion that it ought to be presumed that it was granted to Jose Antonio Diaz through

the proceedings which took place in the year 1767, and their subsequent confirmation, if that was necessary.

The fact that Jarvis, as against the State, or one claiming under it since the judgment was rendered against him, may not be allowed to assert that a valid grant was made or had its origin under the Spanish or Mexican governments prior to December 19, 1836, does not affect the question before us.

The appellant seeks a writ of mandamus; and its right to it depends upon whether the land was vacant and unappropriated public domain at the time it sought to appropriate it.  We concur in the conclusion of the court below that it was not, and that its location was forbidden by section 2, article 14, of the Constitution.

There is no error in the judgment and it will be affirmed.

*Affirmed.*

**Opinion delivered January 27, 1888.**