**MITCHELL et al.**

v.

**TOWN OF REFUGIO et al.**

No. 12559.

Court of Civil Appeals of Texas.

San Antonio.

Feb. 3, 1954.

Rehearing Denied March 3, 1954.

263

Hobart Huson, Jr., San Antonio, James F. Lawler, Houston, Huson & Bissett, Refugio, Dougherty, Morrill & Morrill, Beeville, for appellants.

A. V. Knight, San Antonio, K. D. Hall, Refugio, for appellees.

NORVELL, Justice.

This suit involves the doctrine of stare decisis. It is essentially appellants' conten-

tion that the case of Town of Refugio v. Heard was not fully developed on the facts, and therefore the decision of the Supreme Court in such litigation is not binding in the present suit. In the case mentioned, the Town of Refugio brought suit against certain owners of uplands abutting upon the Mission River, claiming ownership of lands within the river bed. The case was docketed as Cause No. 1172 on the docket of the District Court of Refugio County. An appeal was taken from the judgment of the district court and this Court rendered an opinion which is reported under the style of Town of Refugio v. Heard, Tex.Civ. App., 95 S.W.2d 1008. A writ of error was granted by the Supreme Court, and its opinion (which is primarily involved here) is reported under the style of Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 728. There was a second suit relating for the most part to the question of title by limitation, which was tried in Travis County and also reached the Supreme Court. Heard v. State, 146 Tex. 139, 204 S.W.2d 344, State v. Heard, Tex.Civ.App., 199 S.W.2d 191. In accordance with the usage in the briefs, we shall sometimes hereinafter refer to the earlier suit as the "first Heard case" and the latter as the "second Heard case."

The real property which is the subject matter of the present litigation lies within the bed of Mission River, and is situated south of the highway (U. S. No. 77) crossing and within the four leagues constituting the Refugio town grant or tract. These lands were not involved in the earlier cases above mentioned. The parties hereto, with the exception of the Town of Refugio and perhaps one other party, are likewise different and there is no contention that the doctrine of res judicata is applicable in any way.

The gravamen of appellant's attack upon the Supreme Court's decision in the Heard cases is the assertion that the Court erred in not distinguishing between Mexican "public grants" and private grants and holding, as a consequence, that the general Mexican public policy relating to grants along and across streams was applicable to "public grants." It is asserted that this

"error" on the part of the Supreme Court was due to an insufficient development of the facts in the former suit; that the facts of the present case are essentially different from those of the former case, and as a result the former decision should not be held binding in the present litigation.

The record in this case is voluminous. Appellant asserts sixty-three points of error and it would serve no good purpose to detail the evidence, accepted and rejected, and to relate the various procedural steps taken. We shall, however, set forth the salient portions of the argument advanced by appellants, together with basis upon which our decision rests.

Trial was to the court without a jury. Findings of fact and conclusions of law were requested and filed. We state therefrom the facts deemed essential to the decision by the trial judge, together with his reasons for awarding the Town of Refugio an undivided four-fifths interest in the Mission River bed lying below the highway bridge.

The Town of Refugio possesses a corporate existence under and by virtue of various acts of the Congress of the Republic of Texas, which became effective in the years 1837, 1838, 1839 and 1842 (1 Gammel's Laws 1459, 1499, 2 Gammel's Laws 118, 758), and an act of the Legislature of the State of Texas, which became effective in 1848 (3 Gammel's Laws 430). These Acts of incorporation provided that the corporate boundaries of the town should be coextensive with the four leagues theretofore appropriated by the Mexican Government for those purposes, and the town council was authorized to sell lots or parcels of land within the jurisdiction of the town for municipal purposes. The establishment of the town by Mexican authority took place in 1834, under an executive order of the Governor of Coahuila and Texas, which designated the site of the extinguished Mission of Refugio (of Spanish origin), as the capital town of the Irish colony of Power and Hewetson. The lands allotted to the town were on both sides of the Mission River, as were the lands of the

predecessor mission. A survey of the *ejidos* or town tract was made by James Bray, one of the settlers in the colony. The boundary lines thereof ran on both sides of the river and across the stream. The map made by Bray shows the tract to have been surveyed in the form of a perfect square, having sides of 10,000 varas in length, with the principal town plaza in the center, and containing exactly four square leagues of land. The Mission River is a perennial stream and while not in fact navigable, it is a statutory navigable watercourse as defined by the Act of 1837 Congress, Republic of Texas. 1 Gammel's Laws 1405; Article 5302, Vernon's Ann. Civ. Stats. The Congresses of the Republic at the time they confirmed title to the Refugio *ejidos* knew that the boundary lines thereof crossed the Mission River. No formal patent was ever issued to the *ejidos* and none was necessary to vest title in view of the nature of the original grant and the confirming acts of the Congress of the Republic. Town of Refugio v. Byrne, 25 Tex. 193.

Between 1847 and 1886, the Town of Refugio, from time to time, subdivided and platted the *ejidos* into farm, timber and post oak lots and sold practically all, if not all, such lots, including those riparian to the Mission River. The appellants claim under these deeds. The great majority of these conveyances were by lot number. Appellees say that all of them were, but the trial judge indicated that some conveyances referred to the river as a boundary. The point of difference is not shown to be material. State v. Grubstake Investment Association, 117 Tex. 63, 297 S.W. 202.

The trial court concluded, as a matter of law, that the judgment in this case was controlled and determined by the Supreme Court's decisions in the Heard cases— Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 728, and Heard v. State, 146 Tex. 139, 204 S.W.2d 344, and awarded judgment to the town for four-fifths of the river bed. (The other one-fifth belongs to the State, which was not a party to this suit. As to the State's interest, see report of the second Heard case, 146 Tex. 139,

204 S.W.2d 344, which recounts the proceedings following remand in the first case.) The portion of the river bed involved in this litigation is described by metes and bounds in the judgment following a survey by J. S. Boyles.

As to the record difference in this case and the previous cases, the trial judge made the following findings, viz.:

"I find that the Acts of Incorporation of 1837, 1838, 1839, and charters, of other towns made part thereof by reference, were not in evidence in Cause No. 1172 (the first Heard case).
* * *

"I find that much of the evidence that was produced in this case, regarding the origin, nature and extent of the title of the Refugio pueblo grant, and the Spanish and Mexican laws governing it, and the legislative history of the confirmations thereof, was never produced as evidence in Cause No. 1172, and Cause No. 61483 (the second Heard case)."

The trial judge concluded, as a matter of law, in accordance with the Supreme Court's decision in the first Heard case, that title to the river bed did not emanate from the sovereign until the passage of the Small Bill in 1929, Article 5414a, Vernon's Ann.Tex.Stats., and that such legislation inured to the benefit of the town, insofar as sufficient acreage to make up the total area called for in the original four league grant was concerned. In the interest of clarity, it should here be stated that after the remand of the first Heard case it was determined that the town was entitled to four-fifths and the State to one-fifth of the river bed. See State v. Heard, 146 Tex. 139, 204 S.W.2d 344. Although the court in this case found that the acreage in the river bed, when considered as a part of the original grant, did not create an excess, the adjudication of interests in the former case, as between the State and the town, is a matter of strict res judicata between such parties and was so recognized by the court below.

The trial judge considered a volume of evidence "concerning the law of Mexican grants to pueblos, and the facts and proceedings, and adjudicated decisions, relative to such grants in connection with Texas and Mexican towns, other than the town of Refugio." Appellants requested the court to take judicial notice of certain stated historical facts and incidental laws relating to pueblo grants. However, at the conclusion of the trial the court indicated that such matters sought to be proved by evidence or noticed judicially would not constitute a sufficient basis for a departure from the holdings of the Supreme Court in the Heard cases.

The following excerpt from appellants' "Request for Judicial Notice" fairly well summarizes and illustrates appellants' contentions as to the nature of a pueblo grant, viz.:

"Under the public policies and laws of Spain and Mexico, in force in Texas until her independence, towns, or pueblos, or villas, were established only by the sovereign, or under his or its permission. Such towns were not municipal corporations, or entities, but their *ayuntamientos* were simply part of the political government of the county. The town could be abolished at the will of the sovereign.

"Upon the establishment of a town, an area of land, customarily four square leagues, was designated for its *ejidos*, or town commons. The *ejidos* were public domain set apart to a particular public use. No title passed out of the sovereign into the town, but remained in the sovereign. The rights of the town in the *ejidos* were usufructuary only. One of the essential purposes of *ejidos* was to provide municipal revenues for the town as well as comfort and well-being to its inhabitants. Title remained in the sovereign though dedicated to municipal use, and neither the inhabitants, nor the town, as such, had a vested right in the continued use. The concession could be

extinguished at will of the sovereign. Such a pueblo concession was a public and not a private grant."

From this basis it is argued that a pueblo establishment was dissimilar in nature from a private grant, in that it involved no cession of title, as distinguished from a usufructuary right, and accordingly there was no public policy forbidding the crossing of streams in laying out such grants. In fact, it is pointed out and the records of numerous grants are referred to as demonstrating that the Spanish and Mexican policy in establishing towns was to locate them on both sides of rivers and streams in order that the inhabitants of the town would have available water supply for their livestock and domestic needs.[1]

It is contended, however, that the usufructuary rights awarded to the town and the inhabitants thereof by the Mexican authority in 1834, was, nevertheless, an inchoate or equitable title capable of being confirmed and thus made perfect by the sovereign; that this was done by various Acts of the Congress of the Republic and the Legislature of the State, and as there was no public policy forbidding the crossing of a stream by a public pueblo grant, these confirmations were effective to confer title to the river bed as well as to all other parts of the grant. As a corollary, appellants say that as the town owned the river bed at the time of the various conveyances to their predecessors in title, such deeds should be construed as conveying title to the thread of the stream rather than to the banks thereof only.

Appellants further assert that the provisions of the Small Bill, Article 5414a, Vernon's Ann.Tex.Stats., did not operate to vest the town of Refugio and the State with title to the river bed. It is said that this theory of title was injected into the first

---

1. Appellants' expert, Hon. Harbert Davenport of Brownsville, Texas, testified rather extensively as to the nature of a pueblo grant under the Spanish and Mexican authorities. He indicated his belief that much of his testimony related to matters within the judicial knowledge of the court. State v. Cuellar, 47 Tex. 295; State v. Sais, 47 Tex. 307; and referred to a number of reported cases dealing with pueblo grants which are of legal and historical interest, among them being: City of Brownsville v. Cavazos, 10 Otto 138, 100 U.S. 138, 25 L.Ed. 574 (Brownsville-Matamoros), City of Brownsville v. Basse & Hard, 36 Tex. 461 (Brownsville-Matamoros), Texas Mexican Ry. Co. v. Jarvis, 69 Tex. 527, 7 S.W. 210 (Laredo), Downing v. Diaz, 80 Tex. 436, 16 S.W. 49 (Guerrero), State v. Gallardo, Tex.Civ.App., 135 S.W. 664, Id., 106 Tex. 274, 166 S.W. 369 (Reynosa Viejo), Sullivan v. Solis, 52 Tex.Civ.App. 464, 114 S.W. 456 (Camargo), Alexander v. Garcia, Tex.Civ.App., 168 S.W. 376 (Palafox, the phantom town of the Rio Grande). Davenport quotes from "Ordenanzas de Tierras y Aguas" (Mexico 1844), by Mariano Rivera Galvan, with reference to Spanish pueblos, as follows:

"In consideration that a person cannot live without sustenance; likewise no city can subsist without an income. His Majesty was pleased to grant to the settlements of America * * * in the nature of a gift or town privilege a certain portion of the lands in order that they might secure their subsistence and improve their circumstances, holding a *usufruct* on the pasture and cultivated land, or in any manner their municipal ordinances should dispose." (Translation by Leonidas Hamilton; "Hamilton's Mexican Law," San Francisco, 1882.)

As to California pueblos, it is said in Corpus Juris that:

"A Spanish or Mexican pueblo organized in California under the laws, institutions, and regulations of Spain or Mexico acquired a prior and paramount right to the use of the waters of rivers or streams passing through and over or under the surface of their allotted lands so far as was necessary for the pueblo or its inhabitants, and had the right to distribute to the common lands and to the inhabitants of the pueblo the waters of a nonnavigable river on which the pueblo was situated." 67 C.J. 1130, Waters, § 616.

Other authorities relating to Texas pueblo grants are: Kemper v. Town of Victoria, 3 Tex. 135, Id., 3 Tex. 159 (Victoria); City of Victoria v. Victoria County, 100 Tex. 438, 101 S.W. 190 (Victoria); Dittmar v. Dignowity, 78 Tex. 22, 23, 14 S.W. 268 (San Antonio); Corporation of San Felipe De Austin v. State, 111 Tex. 108, 229 S.W. 845 (San Felipe De Austin).

Heard case by the Supreme Court itself, and was not raised by the parties thereto, and particularly that the Supreme Court did not have the benefit of the evidence adduced upon the trial of the present case.

▮ We are aware of the fact that the bindingness of a precedent or the *ratio decidendi* of a case can not be determined independently of the facts upon which the decision is based. 21 C.J.S., Courts, § 210, p. 383; 14 Am.Jur. 291, Courts, § 79. Upon an examination of the claimed factual differences of the record before us and the two Heard cases heretofore adjudicated, it will be found that such asserted differences relate to historical facts or matters within the field of judicial knowledge. Judicial knowledge of a court may, of course, extend beyond the personal knowledge of the judges making up the court and, as a practical matter, information in the nature of evidence is received in order to enable a court to intelligently make use of its judicial knowledge. State v. Cuellar, 47 Tex. 295. However, from a theoretical standpoint, it is difficult to support the proposition that the judicial knowledge of a court as to historical occurrences and laws of the nineteenth century is greater today than it was in 1937, when the first Heard case was decided by the Supreme Court.

▮ As to historical facts, there is an instance where the Supreme Court of the United States modified a rule of law theretofore declared when the results of an historical study of the jurisdiction of the English Chancery Courts in the time of Queen Elizabeth were brought to its attention. Vidal v. Girard's Executors, 2 How. 127, 11 L.Ed. 205, and Baptist Association v. Hart's Executors, 4 Wheat. 1, 4 L.Ed. 499. This was an instance of a re-examination of its previous holding by a court of final jurisdiction. No doubt other examples may be found in the books. Historical facts are commonly brought to light and the practical, as distinguished from the theoretical, field of judicial knowledge may be enlarged and call for a re-examination of judicial holdings. However, if property rights be involved and a rule declared by

the Supreme Court be directly applicable, such rule should be followed by inferior courts in the absence of extraordinary and unusual circumstances. The trial court based its judgment upon this principle and we believe correctly so. Appellants' theory is essentially another argument why it should be held that title to the river bed passed to the Town of Refugio under and by virtue of legislative enactments prior to 1850. It may be supported by additional historical information not heretofore considered, but if the holding that title did not pass to the town until 1929 is to be changed, such change must be effected by the court that made the holding. For appellants to prevail, the Heard decisions must be overruled and such action lies beyond the authority of this Court. In Corpus Juris Secundum it is stated, with an imposing array of Texas authorities, that:

> "Decisions of a court of last resort are to be regarded as law and should be followed by inferior courts, whatever the view of the latter may be as to their correctness, until they have been reversed or overruled, * * *." 21 C.J.S., Courts, § 197, p. 343.

▮ The same is true as to the construction of the descriptions contained in the deeds under which appellants hold. The Supreme Court in the first Heard case held that these conveyances did not *purport* to convey title to the center of the stream and thus embrace land it did not own, hence the relinquishment provisions of the Small Bill, insofar as the river bed was concerned, inured to the benefit of the Town of Refugio (as to the acreage necessary to make up the amount called for by the grant), as the town had not conveyed such interest and consequently had no assignees thereto. Manry v. Robison, 122 Tex. 213, 56 S.W.2d 438; State v. Grubstake Investment Association, 117 Tex. 53, 297 S.W. 202.

▮ The theory of title in the Town of Refugio to the river bed by operation of the Small Bill is settled law, insofar as this Court is concerned, and this is true even though title by such source was not urged

by the contending parties in this Court or the Supreme Court in the first Heard case. In determining the question of title, the Supreme Court was not obliged to ignore a public law duly enacted by the Legislature, because the parties did not predicate their respective claims thereon, and this Court did not consider the same in accepting the tacit agreement of the parties that the Town of Refugio held title to the river bed prior to the execution of deeds by the town conveying the riparian uplands. A question of title was involved, which necessarily is determinable by all the applicable legislative enactments and not those alone which are suggested by the parties as a basis for their respective claims.

Appellants' brief contains certain assignments attacking the accuracy of Boyle's survey demarking the boundary line between the river bed and the uplands. While these points are not fully briefed, we have considered the same and are of the opinion that they are not well taken. The boundary seems to have been set in accordance with applicable principles of law. State of Oklahoma v. State of Texas, 260 U.S. 606, 43 S.Ct. 221, 67 L.Ed. 428; Motl v. Boyd, 116 Tex. 82, 286 S.W. 458; Arthur A. Stiles, "The Gradient Boundary—The Line Between Texas and Oklahoma Along the Red River" (Foreword by Associate Justice Smedley, Texas Supreme Court), 30 Tex. Law Review 305.

 The briefs discuss at some length the south boundary line of the Refugio town grant. Appellants say that they had prepared an "exhaustive mass of evidence regarding the history of the boundaries of the town tract" in anticipation of a contention that there was an excess in the grant. Upon the remand of the first Heard case, after all parties except the Town of Refugio and the State (which intervened) had been dismissed, it was determined that there was an excess in the grant which accounts for the State's present proprietory interest in the river bed. See statement with reference thereto contained in the opinion of the Supreme Court in the second Heard case. State v. Heard, 146 Tex. 139, 204

S.W.2d 344. Upon the present trial, the town did not take the position that there was an excess in the grant, yet appellants, as stated in their brief, "felt impelled as a matter of precaution to proceed to introduce in evidence the mass of evidence they had assembled showing the true location of the boundaries, and the true facts regarding surveys made subsequent to the date of the town's deeds, and the impossibility of there being an excess. Although the ultimate question of excess is out of the case, this evidence becomes material on another and, perhaps, more vital issue: the adjudication, and we think an unnecessary one, of the location of the southern boundary of the Town Tract."

So far as we have been able to find, there are no parties to this suit who claim under the grant or survey lying immediately south of the Town Tract. This is therefore not a boundary dispute between claimants under adjoining and possibly conflicting grants. The south boundary line at the point it crosses the river is only incidently involved. It could hardly be contended that in a suit of this nature a boundary line could be established which would be binding upon the owners of lands in the adjoining grants by operation of the rule of stare decisis or otherwise. Gus M. Hodges, Stare Decisis in Boundary Disputes, 21 Texas Law Review 241. Appellants' group of points raising the contention discussed do not call for a reversal of the judgment.

 We are further of the opinion that the State of Texas, which refused to intervene herein, was not an indispensable party. The Town of Refugio, as a tenant in common, was authorized to maintain the action.

 We have considered all of appellants' points. None of them presents a reversible error. In our opinion the trial court correctly held that the judgment herein is controlled by the Supreme Court's decisions in the Heard cases, and such judgment is accordingly affirmed.