STATE OF TEXAS, A. J. COYLE AND COYLE-CONCORD OIL COMPANY
v. GRUBSTAKE INVESTMENT ASSOCIATION ET AL.

No. 4428. Decided June 22, 1927.
(297 S. W., 202).

*Dan Moody,* Attorney-General; *R. J. Randolph,* Assistant; *J. Harris Gardner* and *White, Wilcox, Graves & Taylor,* for plaintiffs in error. *(W. A. Keeling,* Attorney-General, and *W. W. Caves,* Assistant, filed briefs on appeal. *Andrews, Streetman, Logue & Mobley,* and *J. C. Logue* also filed briefs and arguments in support of the position of plaintiffs in error.)

It is our contention:

(a) That under the Roman Civil Law, grants of lands upon rivers did not carry the title to the thread of the stream.

(b) If we are mistaken as to the effect of the Roman Law, the Spanish Civil Law made such definite provisions in regard to the beds of rivers as to clearly reserve the title thereto in the public or government, and that the riparian grantee acquired no title to the beds.

(c) That the Mexican decrees and statutes in force in 1835, especially as interpreted and explained by subsequent legislation in Mexico and in Texas, strongly support this construction of the

Spanish Civil Law; and show that under the civil law as applied in Mexico, the title to the beds of rivers did not pass by grants calling for the river as a boundary.

Roman Law—Gould on Waters, Sec. 47; Farnham on Water and Water Rights, Vol. 1, Sec. 49; Galveston v. Menard, 23 Texas, 349, 396; Landry v. Robison, 110 Texas, 295, 219 S. W., 819; Canal Appraisers v. People, 17 Wend. (N. Y.), 588; People v. Page, 39 N. Y. Appellate Div., 110; Smith v. City of Rochester, 92 N. Y., 463, 44 Am. Rep., 401; People v. Canal Appraisers, 33 N. Y., 461; Cox v. State, 3 Blackford's Reports (Ind.), 199.

Spanish Law—Gammel's Laws of Texas, Vol. 1 (Introduction by C. W. Rains); Sayles' Early Laws of Texas, Sec. 4, p. 153; Allen v. West Lumber Co., 244 S. W., 499; Las Siete Partidas, translated from the Spanish by L. Moreau Lislet and Henry Carleton (1820); Law 15, Title 1, Partida 1, Vol. 1, p. 7; Law 31, Title 28, Partida 3, Vol. 1, p. 348 (Hall's Mexican Law, Sec. 1478); Law 32, Title 28, Partida 3, Vol. 1, p. 349 (Hall's Mexican Law, Sec. 1479); Law 27, Title 28, Partida 3, Vol. 1, p. 346 (Hall's Mexican Law, Sec. 1474); Law 29, Title 28, Partida 3, Vol. 1, p. 348 (Hall's Mexican Law, Sec. 1476); Law 26, Title 28, Partida 3, Vol. 1, p. 346 (Hall's Mexican Law, Sec. 1473); Law 28, Title 28, Partida 3, Vol. 1, p. 347 (Hall's Mexican Law, Sec. 1475); Law 30, Title 28, Partida 3, Vol. 1, p. 348 (Hall's Mexican Law, Sec. 1477); Laws 2, 3 and 6, Title 28, Partida 3, Vol. 1, p. 337 (Hall's Mexican Law, Sec. 1468); Morgan v. Livingston, 6 Martin (La.), 224, 246, 229-231; O'Fallan v. Daggett, 4 Mo., 343, 29 Am. Dec., 640; Lorman v. Benson, 8 Mich., 18, 77 Am. Dec., 435; Schmidt on the Civil Law of Spain and Mexico, Arts. 4, 179, 180; Walton's Civil Law in Spain and Spanish America (1900), Art. 407; Hamilton's Mexican Law (1882), Arts. 8 and 9; Wheless' Compendium of the Laws of Mexico (1910), (preface); Civil Code of Louisiana, E. Johns & Co. (1838), Sec. 444; Escriche's Opinions, Hall's Mexican Law, Secs. 1409, 1406, 1388.

Road Cases—Mitchell v. Bass, 26 Texas, 372; 33 Texas, 259; Renthorp v. Bourg, 4 Martin (La.), 97, 138; Dunham v. Williams, 37 N. Y., 251; Mott v. Clayton, 41 N. Y. Supp., 87; Caminez v. Goodman, 104 N. Y. Supp., 68; Pooler v. Sammett, 115 N. Y. Supp., 578; Schaeffer v. Hilliker, 124 N. Y. Supp., 1014; Paige v. Schenectady Ry. Co., 178 N. Y., 102, 70 N. E., 213.

Statutes and Laws of Mexico and Texas—Decrees of Coahuila and Texas, No. 190, Art. 29 (Paschal's Digest, 5th Ed., Art. 697);

(Laws of Texas, Vol. 1, pp. 299, 302) ; Decrees of Coahuila and Texas, No. 272, Art. 22 (Paschal's Digest, 5th Ed., Art. 729) ; (Laws of Texas, Vol. 1, pp. 357, 360) ; Constitution of Republic of Texas, 1836 (Laws of Texas, Vol. 1, p. 1077) ; Act of June 12, 1837, Sec. 2 (Laws of Texas, Vol. 1, p. 1323) ; Act of December 14, 1837, Secs. 21, 42 (Laws of Texas, Vol. 1, p. 1404) ; (Paschal's Digest, 5th Ed., Arts. 4529, 4530) ; Mexican Code of 1871, Art. 802 (Hall's Mexican Law, Sec. 1620) ; Mexican Code of 1871, Art. 897 (Hall's Mexican Law, Sec. 1698) ; Phillips v. Ayres, 45 Texas, 601 ; City of Austin v. Hall, 93 Texas, 596, 57 S. W., 563; Siddall v. Hudson, 201 S. W., 1029, 206 S. W., 381.

On Construction of Calls in the Grant—Welder v. State, 196 S. W., 868.

*Daugherty, Daugherty & Tarlton* and *Gaines, Quin, Harley & Gaines,* for defendants in error.

Under the laws of Mexico in force in the year 1835, when the original grants to the land involved in this suit were made, since said grants called for the Frio River as a boundary, the bed or channel of said river to the middle or thread thereof was thereby conveyed by said government with said grants, no part of the title thereto remaining in said Mexican government, said government only retaining an easement therein for the use by the public of the waters of said river for fishing, irrigation, etc., and the title to the bed of said stream is fully vested in the defendants in this cause as the assignees and grantees of said original grantees. Hammond's First American Edition of Sander's Institutes (Callaghan & Co., Chicago, 1878) ; The Laws of Las Siete Partidas, translated by L. Moreau Lislet and Henry Carleton; Kinney on Irrigation and Water Rights, Second Edition, Vol. 1, pp. 960, 961; Kinkead v. Turgeon, 74 Neb. Sup., 573; 13 A. & E. Ann. Cas., p. 43; Dutton v. Vierling, 152 S. W., 450; Muller v. Lander, 31 Texas, 265; Rhodes v. Whitehead, 27 Texas, 304.

Other cases cited in the course of the argument.

Mr. Justice GREENWOOD delivered the opinion of the court.

The State of Texas, by the Attorney-General, sued the Grubstake Investment Company and others to recover the title to, and possession of, a portion of the bed of the Frio River in the Counties of McMullen and Live Oak. A. J. Coyle and the Coyle-Concord Oil Company, as holders of the State's permit to prospect for oil and gas in the portion of the river bed sued for, adopted the State's

pleadings, becoming co-plaintiffs in the suit. The defendants pleaded a general denial and "not guilty," besides asking special relief.

The facts disclosed, without dispute, that the co-plaintiffs of the State held a mineral permit from the State, and that the defendants owned the tracts of land adjacent to the portion of the river bed in controversy under grants from Coahuila and Texas issued in 1835. Each grant began at a designated corner on the right or left margin of the "Rio Frio," and from thence followed the river with different measurements along its meanders or currents, without crossing the river and without calling for the center of the stream.

It was the contention of defendants that they owned title under the Mexican grants to the middle thread of the Frio River, while the plaintiffs sought judgment against defendants on the ground that the Mexican grants included no portion of the river bed and hence embraced no part of the land sued for.

The District Court rendered judgment for plaintiffs on the ground that "in 1835, when the lands bordering the portion of the Frio River in controversy were granted, the Frio was, under the laws in force in Mexico at that time, a river; that its channel or bed was not included in such grants, but that the complete title thereto was reserved in the Mexican government; and that the title to such channel or bed, so reserved to the Mexican government, passed to the Republic of Texas, and the State of Texas."

The Honorable Court of Civil Appeals, under a carefully reasoned opinion of Chief Justice McClendon, reversed the judgment of the District Court on the conclusion that a grant from Coahuila and Texas, in 1835, to land bordering on a river invested the grantee, under the civil law then in force, with title to the river bed to the medial line of the stream. 272 S. W., 527.

It is manifest, as all parties agree, that there is but one question for decision on the writ of error we have granted for the review of the judgment of the Court of Civil Appeals. The question is whether a grant to land bordering on a river, made by the Mexican government in 1835, carried title to the medial line of the stream.

We concur in the opinion of the Court of Civil Appeals that the civil law in force in Mexico at the date of these grants made no distinction by reason of the lands granted bordering on a non-navigable instead of a navigable river. We also agree with the conclusion of that court, in which counsel for all parties to this suit concur, that we should look to the Partidas for a correct statement

of the law in order to reach a true determination of the extent of these grants. Sayles' Early Laws of Texas, Sec. 4, p. 153.

Considering all the terms of the Partidas dealing with rivers, their beds and their banks, we are constrained to conclude:

First: That the owner of riparian land granted by Coahuila and Texas in 1835 became invested with no title to any portion of the river bed.

Second: That while such owner acquired title to the river bank, yet such title was burdened with certain servitudes.

Third: That the title to the river bed remained in the sovereign despite the riparian grant.

Looking directly to that part of the Partidas dealing specifically with titles to river beds, we find the following provisions in Law 31, Title 28, Third Partida, viz;

"When a river changes its course, to whom will belong the bed where it formerly ran? Rivers sometimes take new courses, abandoning their former beds and leaving them dry. And as disputes may arise about the right of property to the ground thus left, we say it will belong to the owners of the adjoining lands, in proportion to the extent of their estates upon the banks. And the owners of the lands through which the river makes its new bed, will lose the property in the soil it covers, which will now be of the same nature of the former bed, and will, like the river itself, vest in the public."

The express purpose of Law 31 is to make plain the ownership of river beds. It defines the status of the title; first, to the bed of the river with the waters flowing along it; second, to the bed after its abandonment by the waters of the river; and, third, to the bed along a new course carved out by the river. It vests title to the bed along which a river runs in the public. It provides that the adjoining owners *will acquire* title to ground left dry by a change in the river's course in proportion to their estates on the banks. Finally it declares that the instant a river cuts a new bed through land owned by a person in fee simple, such person loses his title to so much of his land as is occupied by such new bed. None of these declarations is consistent with the claim that the owner of riparian land takes title to the center of the river.

Title to the river bed to the center of the stream can not be in the riparian proprietor if it is in the public. If title to midstream vests under a grant to land bordering on a river, there is no occasion nor need to announce the riparian proprietor's ownership of that portion of the bed after the permanent diversion of the waters. Nor would

the Partidas have been apt to have used the future tense with reference to acquisition of the title which had long before vested. Finally, it is utterly repellant to the idea of a riparian proprietor's ownership to the center thread of a river, to provide that the owner of a fee simple title will lose that title to the whole of his soil as soon as it is appropriated by a new river channel.

In contrast to the denial in Law 31 of the title of the adjoining proprietor to any part of the bed occupied by the river is the affirmation in the next succeeding Law 32 of such proprietor's title to such portion of his lands as may be temporarily inundated with river water. Law 32 reads: "Lands are sometimes covered by water, by the inundation of rivers, and remain so covered for many days; and the owner, during such time, loses the possession of them, he nevertheless preserves his right to the property, for as soon as the waters retire to their former channel and leave the lands uncovered, he will enjoy them as before." It was because the law worked a divestiture of even a fee title through changes in the course of a river that Law 32 decreed that no right to property be lost by temporary inundations from a river.

The above interpretation of Law 31 is strengthened by the declaration in Law 6, Title 28, Third Partida, that "rivers, ports and public roads belong to all men in common." The qualification of this declaration by the statement that the portion of the river which constitutes its banks is subject to the dominion and proprietorship of the adjoining owner, burdened with certain specified servitudes, makes clearer, we think, the denial that the riparian proprietor's title extends beyond the banks so as to take in any part of the river bed. The exact language of Law 6 on this point is, "and though the dominion or property of the banks of rivers belongs to the owner of the adjoining estate, nevertheless, every man may make use of them, to fasten his vessel to the trees that grow there, or to refit his vessel, or to put his sails or merchandise there. So fishermen may put and expose their fish for sale there, and dry their nets, or make use of the banks for all other like purposes, which appertain to the art of trade, by which they live."

The Court of Civil Appeals was of the opinion that Law 27, Title 28, Third Partida, was inconsistent with the view that the title of the riparian proprietor extended no farther than the border of the stream. The opinion of that court was that Law 27 contained directions giving effect to the riparian proprietor's pre-existing title.

Law 27 provides:

"How Islands Formed by Rivers Are To Be Divided: Islands sometime rise in rivers, and men dispute about the right of property in them. We therefore say that, if the island rise in the middle of the river, the owners of the estates, on the opposite banks, ought to divide it in the middle, each one taking as much of that half towards his state, as equals the extent of his lands upon the bank. But if it rise entirely in one-half of the river, towards one side, it ought to be divided as is above said, by the owners of the adjacent lands on that side. But if it does not rise entirely in one-half of the river and towards one of its shores, nor in the middle, but so that the greatest part of it be rather on one side than the other, then a cord must be taken and measured out, as long as the river is wide, and after having measured it, of the same length with the width of the river, so that it be neither more nor less, it must be doubled, and the place marked on the island to which the half of the cord extends, from that point a division must be made, between the proprietors of the adjacent banks, agreeably to what is above said, each taking a portion of the island, according to the extent of his estate opposite thereto."

It is true that Law 27 does provide for a division which would be in accord with the extent of the riparian proprietors' estates under the contentions for defendants. But, it should not be presumed that the text was formulated when it answered no need and accomplished no beneficial purpose. If the riparian proprietors actually owned the river beds, the islands or portions thereof within such beds would necessarily belong to such proprietors. Construing Law 27 as designed to operate by means of *future* grants effective when the islands appear, it both harmonizes with our interpretation of the other laws and accomplishes a just result.

It is not without significance that Law 30, Title 28, Third Partida, refers to the owners of the adjoining estates, to whom the islands *will* belong, thus indicating that such owners are not to take under titles already vested but are to take new titles as of the date of the islands' formation. Equally persuasive is the fact that Law 30 vests title to the island or some part thereof not in all persons having vested interests in the adjoining estates but only in the fee owner, recognizing no subsisting right of life tenant or other usufructuary.

The status of titles to the beds of rivers under the Roman Law seems to have been involved in the gravest doubt. Some of the commentators construe the texts in such manner as to reserve the

title to the river beds to the sovereign while others regard the riparian proprietors as the owners of the soil of the river beds. Buckland's Textbook of Roman Law, pp. 186, 212, 213; Gould on Waters, Sec. 47; 3 Kent's Commentaries (13d Ed.), Sec. 413, p. 574.

The Institutes of Justinian provided:

"If a river divides into two channels, and by uniting again these channels transform a man's land into an island, the ownership of that land is in no way altered; but if a river entirely leaves its old channel, and begins to run in a new one, the old channel belongs to the landowners on either side of it in proportion to the extent of their riparian interest, while the new one acquires the same legal character as the river itself, and becomes public. But if after a while the river returns to its old channel, the new channel again becomes the property of those who possess the land along its banks. It is otherwise if one's land is wholly flooded, for a flood does not permanently alter the nature of the land, and consequently if the water goes back the soil clearly belongs to its previous owner." Moyle's Translation of The Institutes of Justinian, p. 39.

Now it seems clear to us that the text writers are correct who view the Partidas as intended not to adopt the civil law as it was set forth in Justinian's Institutes, but to modify that law to fit conditions in Spain and Mexico. Kinney on Irrigation and Water Rights (2d Ed.), Sec. 576, p. 987. The change from the language of the Institutes in Law 31, in Title 28, of the Third Partida, is so marked that we can account for it only as disclosing the purpose either to depart from the old civil law or else to interpret it so as to preclude the extension of the riparian proprietor's title beyond the river's banks.

Law 6 puts the title to public roads in "all men in common" just as it puts the title to rivers in "all men in common." In Mitchell v. Bass, 26 Texas, 381, the court considered the effect of grants, dated in 1831, from the Mexican government to colonists for certain labors which called for the "national road" as parts of their boundaries. The court, through Chief Justice Wheeler, after declaring that under the established doctrine of the common law the grants would carry the fee to the center of the road, added, citing Kent, that the rule of the civil law was said to be different, and it had been so declared by the Supreme Court of Louisiana in an opinion disclosing much learning and research. Chief Justice Wheeler's opinion did not further determine the question. When the case reached the Supreme Court on a subsequent appeal, it was held that under

the Civil Law in force in Mexico in 1831, a grant of land bordering on a public road carried no title to any part of the road, but that the title to the road remained in the sovereign, and that a subsequent patentee from the State was entitled to recover the land formerly constituting a part of the public road. Mitchell v. Bass, 33 Texas, 265. Using the same language, the Partidas could not have intended to prescribe rules relating to public roads different from those relating to rivers.

Law 6, Title 28, Third Partida, puts the title to ports where it puts the title to rivers. In City of Galveston v. Menard, 23 Texas, 392, Judge Roberts declared:

"In the civil law, it is said, that the sea, bays and rivers, with their shores, were common; free to the use of anyone, and are deemed to belong to no one. Angell, 18, 19, 178, 179. Vattel on this subject, says, 'The shores of the sea, incontestably belong to the nation that possesses the country, of which they are a part; and they belong to the class of public things. If civilians have set them down as things common to all mankind, it is only in regard to their use; and we are not thence to conclude, that they considered them as independent of the empire; the contrary appears, from a great number of laws. Ports and harbors are, manifestly, an appendage to, and even a part of, the country; and consequently are the property of the nation. Whatever is said of the land itself, will equally apply to them, so far as respects the consequences of the domain, and the empire.' Angel, 129."

The opinion in Mitchell v. Bass, 33 Texas, 265, cites Arts. 179 and 180 of Schmidt's Laws of Spain and Mexico in support of its declaration of the civil law rule as to a riparian proprietor's want of title to a public road. This treatise upholds that opinion as well as our conclusions, the articles reading as follows:

"Art. 179. Things, viewed in reference to their civil possession, are divided into public, or such as belong to the nation or king; into common; and private.

"Art. 180. Public things are roads, rivers, harbors, etc., the use of which is generally free to all the inhabitants of the country."

Walton's Civil Law in Spain and Spanish America states:

"Art. 407. To the public domain belong:

"1. Rivers and their natural beds.

"2. Continuous or intermittent waters from sources or brooks running in their natural beds and the beds themselves.

"3. Waters rising continuously or intermittently in lands on their beds," etc.

Mr. Kinney states as his conclusion:

"By the time the civil law had been sifted down through the various transformations down to the Government of Mexico, at the time of the treaty of Guadalupe Hidalgo, the civil law rules upon the subject of waters had been modified in a number of ways. Under the Mexican law at this period the rivers and streams belonged to the nation, the use of the waters to the inhabitants in common." Kinney on Irrigation and Water Rights (2d Ed.), Sec. 577, p. 989.

The determination of the case of Phillips v. Ayres, 45 Texas, 609, 611, depended upon the location of a boundary line of a grant made in 1833 by the State of Coahuila and Texas. In locating the line, the court rejected a certain call for course because such course could not be followed without crossing and re-crossing the Leon River. Speaking of running the line in a course which would require the river to be crossed, the court said, "as it was then and still is contrary to law for the surveyor to so run it, the court should not presume that it was in fact thus run, or take it as the proper basis upon which to construct the survey." In a previous part of the opinion the court had said that if a line were run from a certain point "in the course called for in the grant, it will cross and re-cross the Leon River * * * .. But to so run it would conflict with the call for a survey on the left margin of the river, and would violate the law forbidding the crossing of streams of this character."

It would seem from the holding in Phillips v. Ayres that our Texas statutes defining navigable streams and limiting the frontage of surveys thereon and forbidding the inclusion of lands on both sides of the streams, were but adaptations of the former Mexican Laws.

In the case of City of Austin v. Hall, 93 Texas, 597, the Honorable Court of Civil Appeals certified to the Supreme Court the following question:

"Conceding that the land on each side of the river (Colorado) where the road crossed it had been granted by the State to individuals, did the title to the channel of the river remain in the State, so that no prescriptive right to the use thereof as a public road, could be acquired by the plaintiffs?"

The court in a carefully prepared opinion by Judge Brown, answered:

"Art. 4147 of the Revised Statutes reads as follows: 'All lands

surveyed for individuals, lying on navigable water courses, shall front one-half of the square on the water course and the line running at right angles with the general course of the stream, if circumstances of lines previously surveyed under the laws will permit; and all streams, so far as they retain an average width of thirty feet, shall be considered navigable streams within the meaning hereof, and they shall not be crossed by the lines of any survey.' The first part of the article provides for the location of lands upon waters which are navigable according to the general rule of decisions on that subject. The consequences of such a location would be that the grantee would take title only to the water line of the navigable stream and the title of the bed of the stream would remain in the State. * * *

"Under Art. 4147 there can be no difference in the effect of a grant fronting upon a navigable stream and one fronting on a stream declared by the statute to be navigable because of its width. Each grant must give title to the center of the stream or both must be limited to the water line. The statute places all of these streams which have an average width of thirty feet on equality, whether they are actually navigable or not, and does not undertake to change the rule that limits the title of the grantee when the stream is navigable, but, in effect, applies that rule to the stream or that portion of the stream, which, being within the statutory requirement, would not be navigable except for its provisions. The grant of a tract of land upon the margin of a stream which retains an average width of thirty feet gives title to the grantee only to the water line of such stream, the title to the bed of the stream being reserved to the State."

City of Austin v. Hall has been approved in Motl v. Boyd, 116 Texas, 82, 286 S. W., 468; Landry v. Robinson, 110 Texas, 295, 219 S. W., 819; and Welder v. State, 196 S. W., 872, Writ of Error refused June 5, 1918, Complete Writ of Error Table p. 109.

The decision in City of Austin v. Hall, supra, accords with the view expressed by the Supreme Court of the United States that:

"The dominion over navigable waters *and property in the soil under them,* are so identified with the exercise of the sovereign powers of government that a presumption against their separation from sovereignty must be indulged, in construing all grants by the sovereign, of lands to be held in private ownership." Massachusetts v. New York, 271 U. S., 89, 70 L. Ed., 849.

Treating the statutes of Texas as mere adaptations of the previous laws of Mexico, then we should give to the laws of Mexico the same

efficacy in reserving title to the river beds in the sovereign as we give to the Texas statutes.

Concluding that the respective grants under which defendants claim did not extend beyond the river bank, and that the title reserved by the sovereign subsequently passed to the State of Texas and is now held by the State and her mineral permittees—it is ordered that the judgment of the Court of Civil Appeals be reversed and that the judgment of the District Court be affirmed.