## TOWN OF REFUGIO v. HEARD et al.

### No. 9697.

Court of Civil Appeals of Texas. San Antonio.

June 3, 1936.

Rehearing Denied July 1, 1936.

Terrell, Davis, Hall & Clemens and John W. Gaines, all of San Antonio, for appellant.

J. Turner Vance, of Refugio, Kendall & Lawler, of Houston, and Swearingen, Miller & Fly, of San Antonio, for appellees.

BOBBITT, Justice.

This is a suit in trespass to try title, brought by the town of Refugio, Tex., appellant here, against J. F. B. Heard and others, to establish or recover title to 43.913 acres of land, described by metes and bounds, located within the original four-league tract, known as the "town tract" of the town of Refugio, and granted to the town of Refugio from the authorities of the state of Coahuila and Texas, while under Mexican sovereignty, prior to or during the year of 1834. The suit includes two separate tracts of land: The first, or larger tract, lies within the high banks of the Mission river—the bed of said river—within the present corporate limits of the town of Refugio. The second, and smaller tract, 5.28 acres, is located adjoining said river, and is described in a certain deed from the town of Refugio to Allen J. Heard, bearing date July 6, 1880. The propositions raised and submitted concerning these two different tracts will be discussed separately.

All parties hereto apparently concede, and the trial court has held, that under "due authority" the town of Refugio acquired, and there was ·by grant of Mexican sovereignty vested in it, the title to the bed of Mission river.

We are not called upon to express, and we do not express, any opinion as to the correctness of that general conclusion. We are called upon to decide the controversy of the parties to this appeal, and on the record as here presented, that as between the parties hereto, who owns title to that portion of the bed of the river described in the pleadings and contained in the record before us. That is, for the purpose only of deciding the questions raised in this appeal, we accept the conclusion of the trial court that the provisions of the act of 1837, of the Congress of the Republic of Texas, now article 5302 of our Revised Civil Statutes, do not apply to the premises in question, the title to such premises having "passed out of Sovereignty"- before the passage of such act, the- title to the premises, the bed of the river, was vested in the town of Refugio as a public authority or municipality; and the town, having and holding the title to the premises, had the full power and authority to hold and control the same, exclusively and independently of the governments of both the Republic and state of Texas.

Appellant contends, as we view its position, that it did not sell or convey the bed of the river to the respective purchasers who acquired the farm lots or tracts of land located along and abutting the stream; but that the respective conveyances covering such tracts which happened to be along and adjoining the river, extended only to the bank of the stream, and not to the thread or middle of the bed thereof. Appellant asserts, further, that it did not, and in law could not, convey the bed of the stream; that such river bed was held in trust by it for the public, the settlers and colonists in the old days, and the citizens of the Republic and state who owned property and resided in the community and municipality in later years, as at the present time. It is the contention of appellant that under the "public policy" of the sovereign which made the original grant to the colony or town of Refugio, and in all succeeding sovereign authorities exercising paramount authority over the local

authorities, and from which the local or municipal government acquired and held its rights and power, the bed of the Mission river was reserved to the local public authority for the use and benefit of the settlers and residents in the community; that the title to the bed of the stream was, at all times heretofore, and is now, so held in trust; and the premises having been so dedicated and used, they were not sold and conveyed to the various purchasers of the farm lots and tracts of land which happened to be located on and along the banks of the river.

Appellees, on the other hand, take the position, as we understand, that the bed of the river passed to the respective purchasers of the farm lots or tracts of land adjoining and abutting on the stream; that is, a purchaser of a tract bordering on the stream acquired, under his conveyance from the town to his particular tract, the title to the thread or middle of the stream. Furthermore, appellees claim title to the premises in question under their various and respective pleas of limitation.

The cause was tried before the court, without the intervention of a jury, and at the conclusion of the evidence, judgment was rendered against the appellant, and in favor of all the defendants, including all those defendants who filed no answer.

The court, in regular order, filed findings of fact and conclusions of law. We here set out such of the said findings and conclusions as we deem appropriate for a clear understanding and discussion of the material issues and propositions raised in the appeal:

### "Findings of Fact.

"I. Not later than 1834, under the laws of Coahuila and Texas, and due authority, the authorities of Power and Hewitson's Colony recognized and in effect issued to the Town of Refugio, the capital of the Colony, a grant for Four Leagues of land, which crosses the Mission River, and which included the premises in controversy, the boundaries of which have been declared and shown for the purpose of this suit. This grant vested the Town of Refugio with title to the Four Leagues, including the bed of the Mission River.

"II. From time to time, the Town of Refugio conveyed to various persons portion of these Four Leagues, and by deeds to different persons the various Farm Lots, parts of which are involved in the premises claimed. In these conveyances to these Farm Lots references were made to certain Plots of the Farm Lots, and a Plot has been introduced in evidence identifying these Lots, all of which abutted on the Mission River. The Plot introduced is a Plot established and accepted by the Town. In deeds to some of these lots references were made to adjoining lots, but all of them have been identified by the Plot, or otherwise.

"III. By these conveyances the Town conveyed the land under the bed of the river on opposing sides extending to the thread of the stream, or the middle of the bed.

"IV. The lots herein involved covered all of the premises claimed by the defendants, respectively.

"V. By the bed of the stream is meant that area extending between the opposing banks measured from the foot of the banks from the top of the water at its ordinary stage, including sand bars which may exist between the foot of said banks as thus defined.

"VI. Measuring the bed, as defined above, by lines drawn at right angles to the foot of the banks, the average distances within the premises claimed and from its mouth up are 30 feet or more. At normal stages, except in cases of drought, or in cases of floods and abnormal flow of the stream, this stream is of small volume, sometimes in case of drought there is no surface flow. There is one pool, referred to as the Maynard Pool, within the premises claimed, in which at all times there is a pool of water. The normal surface flow of this stream varies from a width that one may jump across to 14 feet, and such normal flow is of a depth varying from ankle deep to 2 feet, and I conclude that this has been the normal flow for at least 50 years before the trial, and that the stream is not now, nor ever has been, navigable in fact.

"VII. It has been shown that the Town parted with its title to all of the premises claimed by defendants by the deeds out of the Town to the various persons.

"VIII. As to the land claimed under a deed, wherein the Town of Refugio in 1880 conveyed some parcels to Allen J. Heard, and wherein Allen J. Heard made a Deed to the Town of Refugio for a right-of-way, Allen J. Heard conveyed a right-of-way which was abandoned in

use in 1901, when a bridge was completed across the stream, and thereafter used instead of such right-of-way, which led to a ford abandoned after the bridge was built and used.

"IX. The plaintiff claims as a fee simple title what is defined as 5.28 acres as vested in it by the last mentioned deed, wherein this right-of-way was defined as lying between the stream and the then fence of Allen J. Heard. The plaintiff has failed to show where this fence was, claiming on the line of the present fence, and that it was the fence existing in 1880. The evidence does not show where the fence was in 1880.

"X. Allen J. Heard was the father of the defendant, J. F. B. Heard, who claims that portion of the premises lying on the other side from the Town proper, measuring from the thread of the river to cover the premises claimed on that side of the thread of the river,—that is, J. F. B. Heard claims from the thread, and from the middle of the stream in controversy on that side, that is on the right side going down stream.

"XI. The other defendants answering herein, claim to the thread, or middle, of the stream, adjoining the defendant Heard, that is, going down the stream along with the thread and along the West side thereof, from the West boundary line of the tract belonging to defendant, W. L. Rea, to the East boundary line of the tract claimed by all the other defendants answering herein, except Rea and Heard, and disclaim as to all the other land claimed by plaintiff. * * *

"XVI. The premises claimed by the plaintiff herein were not shown to be impressed with any public use, but were as other lands or grounds not so impressed, and not dedicated to any public use."

"Conclusions of Law.

"1. The defendants answering herein have shown, to the extent of their respective claims that the Town deeded the lands herein involved to various persons by deeds, extending the title to the thread or the middle of the stream; therefore, whether the defendants be connected or not to these deeds is immaterial, as they are outstanding titles as against the plaintiff. * * *

"4. As to the claim of the Town for five and 28/100 (5.28) acres, as asserted by it, under deed made by A. J. Heard in connection with and as part of a deed made by the Town to A. J. Heard, such deed from Heard to the Town was only a conveyance of a right-of-way and not of any fee simple title, and such right-of-way was abandoned in public use in 1901; therefore, the town can sustain nothing against Heard on the basis of such deed, and, furthermore, if the deed had conveyed a fee simple title, which it did not, the boundaries as against the defendant Heard have not been shown in connection with the relation to the fence and the position of the fence mentioned in that deed.

"5. The defendant Heard has shown five and ten years' limitations to all of the premises claimed by him to the thread of the river.

"6. It is claimed by the plaintiff that the Town, at the time of the making of the deeds by it herein involved, could not and did not convey any part of the bottom of the stream, because of the Act of 1837, of the Congress of Texas, now article 5302, of the Revised Civil Statutes of Texas. This Article has no application to the controversy herein involved, the premises involved in this suit having passed out of the Sovereignty before the passage of such act. I find the Statute of 1837 is not applicable; if it were I would conclude this to be a navigable stream as defined in that statute."

We first dispose of the questions raised concerning the small or 5.28-acre tract of land, not a part of the river bed, and conveyed to the town by Allen J. Heard, on July 6, 1880.

■ From the very terms and wording of this deed, we observe what appears to be a very distinct difference in the character of the title or estate intended by the parties thereto to be conveyed by and through the instrument. The true intention of the parties to the conveyance should be ascertained, if possible, and is, of course, controlling. This instrument is in the form of a contract for the exchange of real property between the parties. It contains two separate and distinct grants or conveyances, and in separate paragraphs: First, the town of Refugio conveys certain land, as described, to the second party, Allen J. Heard, "his heirs and assigns forever, in fee simple, with covenants of general warranty." There can be, we think, no doubt that the true intention and real purpose of the parties is clearly expressed as to

the character of title or estate conveyed in this instance. This conveyance means what it plainly says.

In the second place, however, Allen J. Heard conveys to the first party, the town of Refugio, the property as described, not in fee simple, but "forever for the purposes of a highway." It is clear to us that the very wording of the instrument itself shows the difference in the character of title or estate which the parties intended to and did in fact express and convey in this instance. This is particularly true by reason of the fact that the conveyances were both included in the same instrument, and of course made at the same time, and drawn by the same person or persons. Such is the marked and emphatic difference set out in the granting clause.

We then consider the habendum clause of the instrument, and observe that it in no way conflicts with the distinction and difference set forth in the granting clause, as to the limited estate granted to the town by Heard, in that it provides: "To have and to hold said premises unto the respective grantees, their legal succession, forever," etc. We affirm the holding of the trial court that such instrument conveyed only an easement to the town to use the property for highway purposes, and that it was not so intended by the parties, and that the fee-simple title to said 5.28 acres of land did not pass to the town from Heard under such instrument. West Texas Utilities Co. v. Lee (Tex.Civ.App.) 26 S.W.(2d) 457; Ladies' Benevolent Society v. Magnolia Cemetery Co. (Tex.Com.App.) 288 S.W. 812; Martin v. T. & P. Ry. Co. (Tex.Civ.App.) 53 S.W.(2d) 514; Texas & P. Ry. Co. v. Martin, 123 Tex. 383, 71 S.W.(2d) 867; Stanbery v. Wallace et al. (Tex.Com. App.) 45 S.W.(2d) 198; Benskin v. Barksdale (Tex.Com.App.) 246 S.W. 360; Gibbs v. Barkley et al. (Tex.Com.App.) 242 S. W. 462; Johnson v. Morton, 28 Tex.Civ. App. 296, 67 S.W. 790; Turner v. Montgomery (Tex.Civ.App.) 286 S.W. 624; Associated Oil Co. v. Hart (Tex.Com. App.) 277 S.W. 1043.

Furthermore, it seems plain to us, from the record here presented, that the parties themselves have so construed the instrument. Apparently the town has no real use for the premises except for highway purposes. It is shown that when the new highway bridge was constructed across Mission river at another nearby location, in the year 1901, the road was changed, and the town made no further real use of any portion of said premises. The town at that time abandoned the property for highway or right of way purposes, and, as found in effect by the trial court, A. J. Heard then at that time resumed dominion over such premises, and has, with his assigns and grantees, ever since continuously used the same, as if the right of way conveyance to the town had never been executed. Such action and conduct of the parties themselves in respect to the use of the premises in question confirms the contention of appellees here made that the parties to the instrument in question intended the conveyance from Heard to the town of Refugio to convey only an easement for highway purposes. We therefore affirm the holding of the trial court to that effect, and sustain appellees' counter proposition No. 1. Swink v. City of Dallas (Tex.Com.App.) 36 S.W.(2d) 222; Texas & N. O. R. R. Co. v. Orange County, et al. (Tex.Civ.App.) 206 S.W. 539 (writ refused).

The conclusion reached and above stated relates only to the 5.28-acre tract of land alongside, but which is not a part of, or included in, the bed of Mission river. That is, through such conclusion we do not hold that any part of the river bed is now or has ever been owned by Heard or any other person or individual who may own or claim title to the 5.28-acre tract of land abutting the river. Furthermore, as to that portion of the river bed alongside such small tract of land, and the claims of appellees thereto, by limitation or otherwise, we do not concern ourselves with in this discussion. Those matters will be hereinafter considered in connection with the general principles which, in our opinion, control all such questions in this case.

We next give attention to the questions raised in reference to the title, ownership, and use of that portion of the land involved in the appeal which forms or consists of the bed of Mission river adjoining the tracts of land or farm lots sold by the town of Refugio to various purchasers on and about the year of 1850. Only those portions of the river bed alongside or abutting on certain farm lots or tracts are here at issue. The premises in question are described by metes and bounds in the pleadings. Furthermore,

it is undisputed that all of the premises involved and now under consideration are situated within the "high banks" of the Mission river—the bed of that stream—and that such river, from its mouth up to and beyond the town of Refugio, is of an average width in excess of 30 feet. There is no controversy, then, that such river is a "navigable stream" under the law of this state (article 5302, Revised Statutes of Texas reenacting, in substance, section 42, of the Acts of the Republic of Texas, December 14, 1837), though it is not at all times navigable in fact. It seems to be conceded by appellees herein, that if the above-mentioned statute and the cited act of the Republic of Texas, each defining navigable streams and reserving the beds thereof to the sovereignty, were applicable to the property here in question or in effect at the time the "town of Refugio acquired the title to the Four League Grant," including the "bed of Mission River within the borders or limits of such grant," then appellees would have, under the facts, no valid claim to the premises in question.

Appellees contend that the title to the premises at issue, as well as the title to all of the land within the Four League Grant, including the bed of Mission river, passed out of the then sovereign authority (Mexico, under the laws of the then state of Coahuila and Texas) and vested in the town of Refugio, the capital of the colony, prior to the act of the Republic of Texas, above mentioned, and that the Republic and its successor, the state of Texas, never acquired any authority over the same in so far as the title thereto is concerned. Appellees asserted, and the trial court found and concluded, that the town of Refugio thus holding the paramount title to the premises, sold and conveyed same to the predecessors in title of appellees, and that the town, therefore, now has no title or valid claim thereto. The trial court reached such conclusion on the theory above stated, and upon the further theory that the rule of the common law governed in the conveyances made by the town to its settlers or purchasers at about 1850; that the Mission river was "not navigable within the town of Refugio," because the fee-simple title thereto had passed from the paramount authority and vested in such town prior to the enactment of the act of 1837. Appellees contend that un-der the common-law rule, therefore, when their predecessors purchased farm lots or tracts of land abutting the "non-navigable" stream from the town, they acquired title to land in the river bed to the "thread or middle of the stream." Such contention calls for a determination of the location of the paramount title to the premises, the bed of the river, at the time the several transfers were made, and particularly the character of title or estate owned or held by the town of Refugio at the time it executed and delivered its conveyances to the purchasers of the farm lots or tracts of land abutting that portion of the river bed here involved. It appears necessary in arriving at such determination to carefully consider the history of the Grant to the town of Refugio, and, if possible, trace the title to the premises in litigation.

Appellees frankly concede that they have found no case where the facts are similar, and they state, appellant has cited none. Our own investigation reveals no case in our state where parties have made, under similar facts, the contention here asserted by appellees. We believe, however, that such contention is fully and definitely settled by the decisions of our Supreme Court, when the principles of such decisions are properly applied to the facts of this case.

As stated at the outset, we do not undertake to decide in this proceeding, whether originally the Republic, and later the state of Texas, acquired the paramount title to the river bed in question. We assume, for the sole purpose of this appeal, that the town of Refugio did in fact and in law acquire the fee-simple title to the river bed, along with the title to the abutting lands, and all other lands within the limits of the Four League Grant.

If the fee-simple title to all the land contained in the Grant, including the bed of Mission river, passed out of Mexican sovereignty prior to or during the year 1834, and vested in the town of Refugio as a legal entity, such transfer was made under the terms and conditions of the Grant or under the general colonization laws then in effect in the sovereignty making the Grant. In this instance it was Mexico. We are not furnished with information, by any of the parties to this appeal, as to how or under what particular terms, if any, the title passed into the town of Refugio. It appears, however, that the most accurate data avail-

1014

able concerning the matter is contained in an opinion by the Supreme Court of Texas, by Chief Justice Wheeler, introduced in evidence by appellees, wherein the history of the Grant in question is discussed in some detail. Town of Refugio, et al., v. J. W. Byrne, 25 Tex. 193. This case, however, does not deal with the question of title to the bed of the river or any other property generally recognized and understood to be common property or property reserved to or dedicated to public use.

It is our opinion that the authorities of the town of Refugio took the title to the land within the Four League Grant under the general colonization laws then in effect, and that the town authorities held, administered, and disposed of the land and premises in accordance with the law and public policies of the government authorizing the grant. The purpose of the grant was to encourage the settlement of the lands; to bring people to the then unsettled territory as inhabitants and citizens of the new country. It is a matter of common knowledge and clear history that one of the chief problems confronting the colonizers and the settlers at that time was that of a permanent water supply. All of the early settlements were made at or near a water supply, and as far as possible all of the settlers were favored with a location or grant bordering on and accessible to a stream where this necessity was available. Oil and natural gas were then unheard of, or at least were certainly not considered at that time, even though at the present time the discovery of either seems to cloud the title to any tract of land.

It is contrary to the history, laws, and public policy of the government authorizing the grant in question, and providing the terms and conditions under which the colonizers operated, to assert that the authorities of the town of Refugio were vested with power to so handle or dispose of the land and premises as to defeat the very purpose of the grant. The answer to the problem here at issue is found in the very just and well-established public policy of the state of Texas, the Republic of Texas, and the Mexican and Spanish governments, very similar in all general respects, which existed prior to the Republic.

As we view the question before us, the act of the Republic of Texas, passed in 1837, was intended to carry out the policies in effect when the settlers acquired their properties, and to fairly and justly safeguard their rights therein. That act of the Republic and our present statute embodying its general terms (article 5302, R.S.) are in reality mere adaptations of the previous laws of Mexico on the subject of river beds and water courses and their control by the government for public use.

The authorities hereunder cited show beyond question the origin, history, and true purpose of our own laws relating to water courses, river beds, and navigable streams, and that they are derived from and very largely based upon the laws of Spain and Mexico relating to such matters. Furthermore, they make plain the fact that our present statute on the subject of navigable streams is but a continuation of the definite public policy of the Mexican government which was in effect at the time and binding upon the authorities of the colonizers of the town of Refugio, as well as that municipality itself, at the time is acquired title to the Four League Grant and when it sold the various farm lots or tracts of land in said town to the predecessors in title of appellees herein. Under such policy the authorities of the town of Refugio acquired and held the title to the bed of Mission river within its limits, in trust, for the inhabitants and citizens of the municipality, for their common use and benefit, in somewhat the same fashion that the streets, parks and public plazas were held and administered for and on behalf of the inhabitants of the towns or colonies which were established at the time. As a matter of fact, it was more important to the public, at that time, to protect public water rights than public streets or highways. Motl v. Boyd, 116 Tex. 82, 286 S.W. 458; State v. Bradford, 121 Tex. 515, 50 S.W.(2d) 1065; City of Austin v. Hall, 93 Tex. 591, 597, 57 S.W. 563; State et al. v. Grubstake Investment Association, 117 Tex. 53, 297 S.W. 202; Petty v. City of San Antonio (Tex.Civ.App.) 181 S.W. 224; Anderson v. Polk, 117 Tex. 73, 297 S.W. 219; Dittmar v. Dignowitty, 78 Tex. 22, 14 S.W. 268; Diversion Lake Club v. Heath (Tex. Sup.) 86 S.W.(2d) 441; Act of Congress of Republic of Texas, Dec. 14, 1842, Gammel's Laws, Vol. 1; Article 5302, Revised Statutes 1925; Galveston v. Menard, 23 Tex. 349; Lewis v. San Antonio, 7

Tex. 288; State v. Superior Court of Chelan County, 36 Wash. 381, 78 P. 1011.

In so far as the questions before us are concerned, it is not important, at least not controlling, whether any formal or paper title was delivered to the town authorities at the time the Four League Grant was authorized by the Mexican government and the title thereto was vested in some local authority to hold, administer, and dispose of it, and for the benefit of, the settlers of the colony, in accordance with the laws then in effect, and the public policy of the Mexican government, which was concededly at that time the paramount authority from which the title to all the premises emanated. It may be, as indicated in the case of Town of Refugio v. Byrne, 25 Tex. 193, that prior to the act of the Republic of Texas of February 1, 1842, (when the town was incorporated and the title to the lands therein situated and undisposed of certainly vested in the corporation) that the municipality or town of Refugio, in whatever form it existed, held only "an incipient or equitable title" under the laws of a former government. It is not here now important whether the individual settlers in the town of Refugio received their titles from "Commissioner Vedaurri, as direct representative of the Mexican Government to the colony," or from members of the local town council, who may have been vested with power and authority to transfer good title to the settlers. The titles came from the Mexican government subject to the laws and public policy of that country, and the act of the Republic of Texas of 1837, formally adopted and made definite, for the future in Texas, the policy theretofore followed in respect to the title to and use of navigable streams and watercourses.

■ When the Republic of Texas, by act of its Congress, on February 1, 1842, incorporated the town of Refugio and authorized its officials to receive a patent to the Four Leagues of land from the new government, there was no attempt or intention on the part of the new government to deprive the settlers of their rights, or to modify or impair the just and wise public policy theretofore in effect in respect to navigable streams and water rights in the settlements. There was no substantial change in the general policy at any time, and our present statute on navigable streams reflects the policy which has heretofore at all times been followed by all the governments exercising sovereignty over the town of Refugio. Under that policy, as under our present laws on the subject, a purchaser of land abutting on a navigable stream acquired no title to the soil under the bed of the stream. The lands which underlie navigable streams are held in trust by the state for the use and benefit of all people (State v. Bradford, supra). Under the same general policy and for the same just reasons, the town of Refugio held the title to the Mission river bed, within its territorial limits, in trust, for the use of the people of the colony, and when the farm lots and tracts abutting the river were sold to settlers prior to 1837, they acquired no title to the bed of the stream. Likewise, when other sales of lands and farm lots abutting the river were made at a later time, as were these in question here, at about 1850, the purchasers took the title subject to the act of 1837, and acquired no title to any portion of the bed of Mission River.

■ As a matter of fact, the conveyances from the town of Refugio, according to their own terms, as well as the map of the town, all in evidence, show clearly, we think, that all parties concerned at all times heretofore, until oil and gas was discovered on the property, understood and respected the ownership of the river bed as being in the town of Refugio. None of the farm lots or tracts of land as originally established, and either granted or sold, crossed the river. Each of them received the acreage intended in their grant or purchase, without taking in any part of the bed of the river to which they abutted. There is no presumption that a grant of land bordering on a public or navigable stream by the town extends to the middle of such stream. [Town of Refugio v. Strauch (Tex.Com.App.) 29 S.W.(2d) 1041, 1045].

■ Under our law, Mission river is a navigable stream. This is clear from the record before us. The trial court so found. It has always been a navigable stream, under all sovereigns or governments which have had any authority over the title with which we are concerned. It is clear that under our own laws, both of the Republic and the state, as well as the Mexican laws, the title to public property, such as a navigable stream, never passes except upon the very definite and

expressed action on the part of sovereign authority. All grants of interests in or title to such public property as the beds of navigable streams are strictly construed against the grantee. The contention of appellees herein and the conclusion of the trial court, that the title to the bed of Mission river adjacent to the lands acquired by the purchasers, passed with the land to the middle or thread of the stream is contrary to the holding of our Supreme Court, and is therefore overruled. Town of Refugio v. Strauch (Tex. Com.App.) 29 S.W.(2d) 1041, 1045; Mitchell v. Bass, 33 Tex. 259; Schutze v. Dabney (Tex.Civ.App.) 204 S.W. 342; Dabney v. Schutze (Tex.Com.App.) 228 S.W. 176; City of Austin v. Hall, 93 Tex. 591, 57 S.W. 563; State v. Grubstake Investment Association, 117 Tex. 53, 297 S.W. 202; State v. Bradford, 121 Tex. 515, 50 S.W.(2d) 1065; Dolan v. Walker, 121 Tex. 361, 49 S.W.(2d) 695; Rosborough v. Picton, 12 Tex.Civ.App. 113, 34 S.W. 791, 43 S.W. 1033.

We sustain appellant's proposition No. 4, and hold that the act of the Congress of the Republic of Texas, of date December 14, 1837, now article 5302 of our Revised Civil Statutes, did apply to and controlled the title to the bed of Mission river, within the territorial limits of the Four League Grant made to the town of Refugio; that the title to such river bed was vested in the "Town Authority," and was thus held, in trust, for public use and benefit; that as and when the respective conveyances were made by the Town to purchasers of the farm lots or tracts adjoining or abutting that stream, no part of the "River Bed" passed therewith, and the town, in its public character and capacity now owns and holds all such title to such river bed as it acquired originally from the Mexican government and all such title as was confirmed to it or vested in it by the act of the Congress of the Republic of Texas and any law or act of the state of Texas thereafter. Anderson v. Polk, 117 Tex. 73, 297 S.W. 219; State v. Grubstake Inv. Ass'n, 117 Tex. 53, 297 S.W. 202, and authorities in each discussed.

■ In view of the fact, fully disclosed and established by the evidence, that the Mission river is and has at all times heretofore been, under the law, a navigable stream, and as such dedicated to and definitely reserved for public purposes and uses by the paramount authority, no part of its bed has ever been, nor is it now, subject to be acquired by any person under any of our several statutes of limitation. No part of such river bed can be acquired by any presumption or claim. Only by the express and definite act of the paramount authority or sovereignty can the title to any portion of such property be lost to the public. State v. Bradford, supra.

On the assumption that the sovereign legally passed the title to the river bed to the town under the Mexican rule, and on the authority of the above-cited cases, the town so owns and holds the title thereto for the public, in trust, and it cannot by a simple sale of adjoining lands barter away the rights of the public therein, as here contended by appellees, any more than it could sell the public streets, plazas, or the town hall, without fully complying with all the laws enacted for the protection of the public in such matters. Furthermore, as to such public property, so held in trust, no person can acquire an interest in or claim to it, against the town, by or through any of our statutes of limitation. Above cited cases, and City of Austin v. Hall, 93 Tex. 591, 57 S.W. 563; Orange Lumber Co. v. Thompson, 59 Tex.Civ.App. 562, 126 S.W. 604; Mitchell v. Bass, 33 Tex. 259.

We, therefore, sustain each of appellant's propositions relating to all claims of appellees based upon their several pleas of limitation and the action of the trial court thereon.

And in this connection we hold that appellee J. F. B. Heard has never held nor acquired, by limitation or otherwise, any interest in the bed of the river abutting the 5.28-acre tract of land or elsewhere.

■ Appellant's proposition number sixteen is also sustained. Ryals, Hogan, and Johnson, defendants in the trial court, were duly cited to appear and answer appellant's petition. Each defaulted, and at the close of the evidence, on motion of appellant, the trial court should have rendered judgment against said defendants and in favor of appellant. It was not necessary, as to such three defaulting parties, that appellant should formally move for an interlocutory judgment against them before the end of the trial. Articles 2154 and 2155, R.S.; American Salt Co. v. Heidenheimer, 80 Tex. 344, 15 S.W. 1038, 26 Am.St.Rep. 743.

The questions presented in this appeal, being unusually important, and concerning

the early history of land titles in our state, have called for much research and writing. It is conceded by all parties that the issues, as here presented, have not been heretofore submitted to the courts on a similar state of facts. Able counsel for all the parties have filed exhaustive and helpful briefs, which have been of great assistance to the court.

For the reasons above stated and on the authorities cited, it is our duty to affirm the judgment of the trial court awarding the title to the 5.28-acre tract of land in favor of appellee, J. F. B. Heard, and to reverse and render such judgment against all the appellees in favor of appellant, as to the title and possession of the remaining lands and premises—the bed of Mission river—as described in its pleadings, and it is so ordered.

Affirmed in part; reversed and rendered in part.